## ARIZONA *v.* CALIFORNIA ET AL.

No. 19, original.   Argued March 9, 10, 1931.—Decided May 18, 1931.

424

426

*Solicitor General Thacher,* with whom *Mr. Robert P. Reeder* was on the brief, for Wilbur, Secretary of the Interior.

428

430

431

432

*Mr. U. S. Webb,* Attorney General of California, with whom *Messrs. W. B. Mathews* and *Charles L. Childers* were on the brief, for California.

434

*Mr. Thomas H. Gibson*, with whom *Messrs. John S. Underwood*, Attorney General of Colorado, *E. K. Neumann*, Attorney General of New Mexico, *Gray Mashburn*, Attorney General of Nevada, *Clarence L. Ireland*, *Delph E. Carpenter*, *L. Ward Bannister*, and *Francis C. Wilson* were on the brief, for Colorado, New Mexico, and Nevada; and *Messrs. George P. Parker*, Attorney General of Utah, and *James A. Greenwood*, Attorney General of Wyoming, with whom *Messrs. William W. Ray* and *William O. Wilson* were on the brief, for Utah and Wyoming.

435

436

438

*Messrs. Dean G. Acheson* and *Clifton Mathews,* with whom *Mr. K. Berry Peterson,* Attorney General of Arizona, was on the brief, for Arizona.

439

440

442

444

446

447

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The Boulder Canyon Project Act, December 21, 1928, c. 42, 45 Stat. 1057, authorizes the Secretary of the Interior, at the expense of the United States, to construct at Black Canyon on the Colorado River, a dam, a storage reservoir, and a hydroelectric plant; provides for their control, management, and operation by the United States; and declares that the authority is conferred " subject to the terms of the Colorado River compact," " for the purpose of controlling the floods, improving navigation and regulating the flow of the Colorado River, providing for storage and for the delivery of the stored waters thereof for reclamation of public lands and other beneficial uses

exclusively within the United States, and for the generation of electrical energy as a means of making the project herein authorized a self-supporting and financially solvent undertaking."

The Colorado River Compact is an agreement for the apportionment of the water of the river and its tributaries. After several years of preliminary informal discussion, Colorado, Wyoming, Utah, New Mexico, Arizona, Nevada, and California—the seven States through which the river system extends—appointed commissioners in 1921 to formulate an agreement; and Congress, upon request, gave its assent, and authorized the appointment of a representative to act for the United States. Act of August 19, 1921, c. 72, 42 Stat. 171. On November 24, 1922, these commissioners and the federal representative signed an agreement to become effective when ratified by Congress and the legislatures of all of these States. The Boulder Canyon Project Act approved this agreement subject to certain limitations and conditions, the approval to become effective upon the ratification of the compact, as so modified, by the legislatures of California and at least five of the six other States. The legislatures of all these States except Arizona ratified the modified compact and the Act was accordingly declared to be in effect. Proclamation of June 25, 1929, 46 Stat. 20.

On October 13, 1930, Arizona filed this original bill of complaint against Ray Lyman Wilbur, Secretary of the Interior, and the States of California, Nevada, Utah, New Mexico, Colorado and Wyoming. It charges that Wilbur is proceeding in violation of the laws of Arizona to invade its quasi-sovereign rights by building at Black Canyon on the Colorado River a dam, half of which is to be in Arizona, and a reservoir to store all the water of the river flowing above it in Arizona, for the purpose of diverting part of these waters from Arizona for consumptive use

elsewhere, and of preventing the beneficial consumptive use in Arizona of the unappropriated water of the river now flowing in that State; that these things are being done under color of authority of the Boulder Canyon Project Act; that this Act purports to authorize the construction of the dam and reservoir, the diversion of the water from Arizona, and its perpetual use elsewhere; that the Act directs and requires Wilbur to permit no use or future appropriation of the unappropriated water of the main stream of the Colorado River, now flowing in Arizona and to be stored by the said dam and reservoir, except subject to the conditions and reservations contained in the Colorado River Compact; and that the Act thus attempts to enforce as against Arizona, and to its irreparable injury, the compact which it has refused to ratify. The bill prays that the compact and the Act " and each and every part thereof, be decreed to be unconstitutional, void and of no effect; that the defendants and each of them be permanently enjoined and restrained from enforcing or carrying out said compact or said act, or any of the provisions thereof, and from carrying out the three pretended contracts hereinabove referred to, or any of them, or any of their provisions, [meaning certain contracts executed by Wilbur on behalf of the United States for the use of the stored water and developed power after the project shall have been completed] and from doing any other act or thing pursuant to or under color of said Boulder Canyon Project Act."

Process was made returnable on January 12, 1931; and on that day all of the defendants moved that the bill be dismissed. The grounds assigned in the motions are (1) that the bill does not join the United States, an indispensable party; (2) that the bill does not present any case or controversy of which the Court can take judicial cognizance; (3) that the proposed action of the defendants will not invade any vested right of the plaintiff or of any

of its citizens; (4) that the bill does not state facts sufficient to constitute a cause of action against any of the defendants. The case was heard on these motions.

The wrongs against which redress is sought are, first, the threatened invasion of the quasi-sovereignty of Arizona by Wilbur in building the dam and reservoir without first securing the approval of the State Engineer as prescribed by its laws; and, second, the threatened invasion of Arizona's quasi-sovereign right to prohibit or to permit appropriation, under its own laws, of the unappropriated water of the Colorado River flowing within the State. The latter invasion, it is alleged, will consist in the exercise, under the Act and the compact, of a claimed superior right to store, divert, and use such water.

*First.* The claim that quasi-sovereign rights of Arizona will be invaded by the mere construction of the dam and reservoir rests upon the fact that both structures will be located partly within the State. At Black Canyon, the site of the dam, the middle channel of the river is the boundary between Nevada and Arizona. The latter's statutes prohibit the construction of any dam whatsoever until written approval of plans and specifications shall have been obtained from the State Engineer; and the statutes declare in terms that this provision applies to dams to be erected by the United States. Arizona Laws 1929, c. 102, §§ 1–4. See also Revised Code of 1928, §§ 3280–3286. The United States has not secured such approval; nor has any application been made by Wilbur, who is proceeding to construct said dam in complete disregard of this law of Arizona.

The United States may perform its functions without conforming to the police regulations of a State. *Johnson* v. *Maryland,* 254 U. S. 51; *Hunt* v. *United States,* 278 U. S. 96. If Congress has power to authorize the construction of the dam and reservoir, Wilbur is under no obligation to submit the plans and specifications to the State

Engineer for approval.[1]   And the Federal Government has the power to create this obstruction in the river for the purpose of improving navigation if the Colorado River is navigable. *Pennsylvania* v. *Wheeling and Belmont Bridge Co.*, 18 How. 421, 430; *South Carolina* v. *Georgia*, 93 U. S. 4, 11; *Gibson* v. *United States*, 166 U. S. 269; *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53, 64; *Greenleaf Johnson Lumber Co.* v. *Garrison*, 237 U. S. 251, 258–68. Arizona contends both that the river is not navigable, and that it was not the purpose of Congress to improve navigation.

The bill alleges that " the river has never been, and is not now, a navigable river." The argument is that the question whether a stream is navigable is one of fact; and that hence the motion to dismiss admits the allegation that the river is not navigable.   It is true that whether a stream is navigable in law depends upon whether it is navigable in fact; *United States* v. *Utah, ante,* p. 64;[2] and that a motion to dismiss, like a demurrer, admits every well-pleaded allegation of fact, *Payne* v. *Central Pacific Ry. Co.*, 255 U. S. 228, 232.   But a court may take judicial notice that a river within its jurisdiction is navigable.   *United States* v. *Rio Grande Dam & Irrigation Co.*, 174 U. S. 690, 697; *Wear* v. *Kansas*, 245 U. S. 154, 158.

---

[1] The further allegation that the proposed dam, reservoir, and power plants, when completed, may not be subject to the taxing power of Arizona, may be disregarded. The Act provides that the title to such works shall remain forever in the United States, and such exemption is but an ordinary incident of any public undertaking by the Federal Government.

[2] Compare *The Daniel Ball*, 10 Wall. 557, 563; *The Montello*, 20 Wall. 430; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Commissioners*, 168 U. S. 349; *Leovy* v. *United States*, 177 U. S. 621; *Economy Light & Power Co.* v. *United States*, 256 U. S. 113; *Oklahoma* v. *Texas*, 258 U. S. 574, 590, 591; *Brewer-Elliott Oil & Gas Co.* v. *United States*, 260 U. S. 77, 86; *United States* v. *Holt State Bank*, 270 U. S. 49, 56, 57.

We know judicially, from the evidence of history, that a large part of the Colorado River south of Black Canyon was formerly navigable,[3] and that the main obstacles to navigation have been the accumulations of silt coming from the upper reaches of the river system, and the irregularity in the flow due to periods of low water.[4]   Commercial

[3] Navigability extended as far north as the mouth of the Virgin River at Black Canyon. See Report Upon the Colorado River of the West, H. R. Ex. Doc. No. 90, 36th Cong., 1st Sess., June 5, 1860, pts. I–II, and maps; H. R. Mis. Doc. No. 37, 42d Cong., 1st Sess., April 15, 1871; H. R. Ex. Doc. No. 18, 51st Cong., 2d Sess., December 2, 1890; H. R. Doc. No. 101, 54th Cong., 1st Sess., December 27, 1895; H. R. Doc. No. 67, 56th Cong., 2d Sess., December 5, 1900; Ann. Rep., Chief of Engineers, War Department, 1879, pp. 1773–85; Hodge, Arizona As It Is, (1877) pp. 208–10; Hinton, Handbook to Arizona, (1878) pp. 66–67, 371–72, and maps; Freeman, The Colorado River, (1923) cc. I, V, VII, particularly pp. 146–67; Sloan, History of Arizona, (1930), vol. i, pp. 216–36.

By the Act of July 5, 1884, c. 229, 23 Stat. 133, 144, Congress appropriated $25,000 for the improvement of navigation on the Colorado River between Fort Yuma and a point thirty miles above Rioville, which was located at the mouth of the Virgin River. An additional $10,000 for a levee at Yuma was appropriated by the Act of July 22, 1892, c. 158, 27 Stat. 88, 108–09. See H. R. Doc. Nos. 204 and 237, 58th Cong., 2d Sess., December 18, 1903. As to navigability north and east of Boulder Canyon, see *United States* v. *Utah, ante,* p. 64.

[4] See Report by Director of Reclamation Service on Problems of Imperial Valley and Vicinity, Sen. Doc. No. 142, 67th Cong., 2d Sess., February 23, 1922, pp. 3–10, 240; Report of the Colorado River Board on the Boulder Dam Project, H. R. Doc. No. 446, 70th Cong., 2d Sess., December 3, 1928, pp. 12–14; Report of the All-American Canal Board, July 22, 1919, pp. 24–33. For the geological history of the lower Colorado area, see Information Presented to the House Committee on Irrigation and Reclamation in connection with H. R. 2903, 68th Cong., 1st Sess., 1924, pp. 135–43. All the former documents on the Colorado River Development were adopted as part of the hearings on Boulder Canyon Project Act. See Hearings Before the House Committee on Irrigation and Reclamation on H. R. 5773, 70th Cong., 1st Sess., January 6, 1928, pp. 8–10.

disuse resulting from changed geographical conditions and a Congressional failure to deal with them, does not amount to an abandonment of a navigable river or prohibit future exertion of federal control. *Economy Light & Power Co. v. United States,* 256 U. S. 113, 118, 124. We know from the reports of the committees of the Congress which recommended the Boulder Canyon project that, in the opinion of the government engineers, the silt will be arrested by the dam; that, through use of the stored water, irregularity in its flow below Black Canyon can be largely overcome; and that navigation for considerable distances. both above and below the dam will become feasible.[5] Compare *St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners,* 168 U. S. 349, 359; *United States v. Cress,* 243 U. S. 316, 326.

The bill further alleges that the "recital in said act that the purpose thereof is the improvement of naviga-

---

[5] The House Committee on Irrigation and Reclamation stated that one of the purposes of the Act was to have the flow of the river below the dam "regulated and even" and thus "susceptible to use by power boats and other small craft. The great reservoir will, of course, be susceptible of navigation." See Boulder Canyon Project, H. R. Rep. 918, 70th Cong., 1st Sess., March 15, 1928, p. 6. As to control of silt deposits, see *id.,* pp. 16–17. A similar report was made to the Senate. See Boulder Canyon Project, Sen. Rep. 592, 70th Cong., 1st Sess., March 20, 1928, pp. 5–7, 16–20. The House Committee said in summary: "The proposed dam would improve navigation probably more than any other works which could be constructed. The dam will so regulate the flow as to make the river very practicable of navigation for 200 miles below and impound water above which could easily be navigated for more than 75 miles." H. R. Rep. 918, *supra,* p. 22. Compare Hearings Before the House Committee on Irrigation and Reclamation on H. R. 5773, 70th Cong., 1st Sess., pt. 3, January 13–14, 1928, pp. 340–41; Hearings Before the Senate Committee on Irrigation and Reclamation on S. 728 and S. 1274, *id.,* January 17–21, 1928, pp. 368–77, 384, 420–21. Since below Black Canyon the Colorado River is a boundary stream, such navigation will be at least partially interstate.

tion" "is a mere subterfuge and false pretense." It quotes a passage in Art. IV of the compact, to which the Act is subject, which declares that "inasmuch as the Colorado River has ceased to be navigable for commerce and the reservation of its waters for navigation would seriously limit the development of its basin, the use of its waters for purposes of navigation shall be subservient to the uses of such waters for domestic, agricultural, and power purposes;" and alleges that "even if said river were navigable, the diversion, sale and delivery of water therefrom as authorized in said act, would not improve, but would destroy, its navigable capacity."[6]

Into the motives which induced members of Congress to enact the Boulder Canyon Project Act, this Court may not enquire. *McCray* v. *United States*, 195 U. S. 27, 53–59; *Weber* v. *Freed*, 239 U. S. 325, 329–30; *Wilson* v. *New*, 243 U. S. 332, 358–59; *United States* v. *Doremus*, 249 U. S. 86, 93–94; *Dakota Central Tel. Co.* v. *South Dakota*, 250 U. S. 163, 187; *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, 161; *Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180, 210.[7] The Act declares that the authority to construct the dam and reservoir is conferred, among other things, for the purpose of "improving navigation and regulating the flow of the river." As the river is navigable and the means which the Act provides are not unrelated

---

[6] Reliance is also had upon the fact that the bill as originally introduced contained no reference to navigation, but that the statements of this purpose, found in the Act, were inserted during the course of the hearings. See Minority Views, H. R. Rep. No. 918, 70th Cong., 1st Sess., pt. 3, pp. 14–18.

[7] Similarly, no inquiry may be made concerning the motives or wisdom of a state legislature acting within its proper powers. *United States* v. *Des Moines Nav. & Ry. Co.*, 142 U. S. 510, 544; *Atchison, Topeka & Santa Fé R. Co.* v. *Matthews*, 174 U. S. 96, 102; *Calder* v. *Michigan*, 218 U. S. 591, 598; *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 357, 366. Compare *O'Gorman & Young, Inc.*, v. *Hartford Fire Ins. Co.*, 282 U. S. 251, 258.

to the control of navigation, *United States* v. *River Rouge Improvement Co.*, 269 U. S. 411, 419, the erection and maintenance of such dam and reservoir are clearly within the powers conferred upon Congress. Whether the particular structures proposed are reasonably necessary, is not for this Court to determine. Compare *Fong Yue Ting* v. *United States*, 149 U. S. 698, 712–14; *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 340; *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53, 65, 72–73; *Everard's Breweries* v. *Day*, 265 U. S. 545, 559. And the fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional power. Compare *Veazie Bank* v. *Fenno*, 8 Wall. 533, 548; *Kaukauna Water Power Co.* v. *Green Bay & Mississippi Canal Co.*, 142 U. S. 254, 275; *In re Kollock*, 165 U. S. 526, 536; *Weber* v. *Freed, supra; United States* v. *Doremus, supra*.

It is urged that the Court is not bound by the recital of purposes in the Act; that we should determine the purpose from its probable effect; and that the effect of the project will be to take out of the river, now non-navigable through lack of water, the last half of its remaining average flow. But the Act specifies that the dam shall be used: " First, for river regulation, improvement of navigation and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights . . .; and third, for power." It is true that the authority conferred is stated to be " subject to the Colorado River Compact," and that instrument makes the improvement of navigation subservient to all other purposes. But the specific statement of primary purpose in the Act governs the general references to the compact. This Court may not assume that Congress had no purpose

to aid navigation, and that its real intention was that the stored water shall be so used as to defeat the declared primary purpose. Moreover, unless and until the stored water, which will consist largely of flood waters now wasted, is consumed in new irrigation projects or in domestic use, substantially all of it will be available for the improvement of navigation. The possible abuse of the power to regulate navigation is not an argument against its existence. *Lottery Case,* 188 U. S. 321, 363; *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 168–69; *Wilson* v. *New,* 243 U. S. 332, 354; *Hamilton* v. *Kentucky Distilleries, supra; Alaska Fish Salting & By-Products Co.* v. *Smith,* 255 U. S. 44, 48.

Since the grant of authority to build the dam and reservoir is valid as an exercise of the Constitutional power to improve navigation, we have no occasion to decide whether the authority to construct the dam and reservoir might not also have been constitutionally conferred for the specified purpose of irrigating public lands of the United States.[8] Compare *United States* v. *Rio Grande Dam and Irrigation Co.,* 174 U. S. 690, 703; *United States* v. *Alford,* 274 U. S. 264. Or for the speci-

[8] "A large part of the land through which the Colorado River flows, or which is adjacent or tributary to it, is public domain of which the United States is the proprietor." Colorado River Compact, H. R. Doc. No. 605, 67th Cong., 4th Sess., March 2, 1923, p. 6. As to extent of this land and irrigation projects on it in connection with the Boulder Canyon Dam, see Report of the Director of the Reclamation Service on Problems of Imperial Valley and Vicinity, Sen. Doc. No. 142, 67th Cong., 2d Sess., February 23, 1922, appendices C-D. See also Department of Interior, Twenty-fifth Ann. Rep. Bureau of Reclamation (1926), pp. 2–29; Vacant Public Lands on July 1, 1929, Department of Interior, General Land Office, Circular No. 1197, pp. 3-10; Report of the International Water Commission, H. R. Doc. No. 359, 71st Cong., 2d Sess., April 21, 1930, pp. 98-177, and Bibliography, p. 97.

fied purpose of regulating the flow and preventing the floods in this interstate river.[9]   Or as a means of conserving and apportioning its waters among the States equitably entitled thereto.   Or for purpose of performing international obligations.[10]   Compare *Missouri* v. *Holland,* 252 U. S. 416. ·

*Second.*   The further claim is that the mere existence of the Act will invade quasi-sovereign rights of Arizona by preventing the State from exercising its right to prohibit or permit under its own laws the appropriation of unappropriated waters flowing within or on its borders. The opportunity and need for further appropriations are fully set forth in the bill.   Arizona is arid and irrigation is necessary for cultivation of additional land.   The future growth and welfare of the State are largely dependent

---

[9] Compare the legislation for Mississippi river flood control, independent of navigation improvements.   Joint Resolution of May 2, 1922, c. 175, 42 Stat. 504; Act of September 22, 1922, c. 427, § 13, 42 Stat. 1038, 1047; Act of December 22, 1927, c. 5, 45 Stat. 2, 38; and particularly Act of May 15, 1928, c. 569, 45 Stat. 534.

[10] The Colorado River and its tributaries have frequently been the subject of treaties between the United States and Mexico.   See Treaty of Guadalupe Hidalgo, February 2, 1848, Art. VII, in Malloy, United States Treaties, vol. i, pp. 1107, `1111; Gadsden Treaty, December 30, 1853, Art. IV, *id.,* pp. 1121, 1123; Boundary Convention of March 1, 1889, Arts. I, V, *id.,* pp. 1167-92. Compare the 1912 proposals reported in Hearings Before the House Committee on the Irrigation of Arid Lands, 66th Cong., 1st Sess., July 9-14, 1919, Append., pp. 323–26.   As to the Rio Grande, see Convention of May 21, 1906, Treaty Series No. 455; 21 Op. Atty. Gen. 274, 282, 518; Sen. Doc. No. 154, 57th Cong., 2d Sess., February 14, 1903.   For the international aspects of the proposed Colorado River Development, see Hearings Before the House Committee on Irrigation of Arid Lands, 66th Cong., 1st Sess., July 9–14, 1919, Append., pp. 323–48; Colorado River Compact, H. R. Doc. No. 605, 67th Cong., 4th Sess., March 2, 1923, pp. 5-6; Report of the All-American Canal Board, July 22, 1919, pp. 14-15; Report of International Water Commission, *supra* Note 8, pp. 17-23, 85-283.

upon such reclamation. It is alleged that there are within Arizona 2,000,000 acres not now irrigated which are susceptible of irrigation by further appropriations from the Colorado River.[11] To appropriate water means to take and divert a specified quantity thereof and put it to beneficial use in accordance with the laws of the State where such water is found, and, by so doing, to acquire under such laws, a vested right to take and divert from the same source, and to use and consume the same quantity of water annually forever, subject only to the right of prior appropriations. Under the law of Arizona, the perfected vested right to appropriate water flowing within the State cannot be acquired without the performance of physical acts through which the water is and will in fact be diverted to beneficial use. Topographical conditions make it necessary that land in the State be irrigated in large projects. The Colorado River flows, both on the boundary between Arizona and Nevada, and in Arizona alone, through an almost continuous series of deep canyons, the walls of which rise in Arizona to a height varying from a few hundred to more than 5,000 feet. The cost of installing the dams, reservoirs, canals, and distribution works required to effect any diversion, will be very heavy; and financing on a large scale is indispensable. Such financing will be impossible unless it clearly appears that, at or prior to the time of constructing such works, vested rights to the permanent use of the water will be acquired.

---

[11] Of the total length of 1,293 miles of the Colorado River, 688 miles are within or on the boundaries of Arizona. After leaving Utah, the main river flows for 292 miles wholly in Arizona. Then, the middle of the channel forms the boundary between Arizona and Nevada for 145 miles; and for 235 miles, the boundary between Arizona and California. Tributaries of the river flow within Arizona for a combined length of 836 miles, and most of these enter the main stream below Black Canyon.

The alleged interference with the right of the State to control additional appropriations is based upon the following facts. The average annual flow of the Colorado River system, including the tributaries, is 18,000,000 acre-feet.[12] Only 9,000,000 acre-feet have been appropriated by Arizona and the defendant States. Of this 3,500,000 acre-feet have been appropriated in Arizona under its laws, and the remaining 5,500,000 acre-feet by the other States. The 9,000,000 acre-feet unappropriated are now subject to appropriation in Arizona under its laws. It is alleged that there are numerous sites suitable for the construction, maintenance, and operation of dams and reservoirs required for the irrigation of land in Arizona; and that actual projects have been planned for the irrigation of 1,000,000 acres, including 100,000 acres owned by the State. For this purpose 4,500,000 acre-feet annually will be additionally required. Permits to appropriate this water have been granted by the State; and definite plans to carry out projects for the building of dams on that part of the river flowing in or on the borders of Arizona have been approved by the State Engineer. It is stated that but for the passage of the Boulder Canyon Project Act, construction work would long since have commenced.

It is conceded that the continued use of the 3,500,000 acre-feet of water already appropriated in Arizona is not now threatened. And there is no allegation that at the present time the enjoyment of these rights is being interfered with in any way. The claim strenuously urged is that the existence of the Act, and the threatened exercise of the authority to use the stored water pursuant to its terms, will prevent Arizona from exercising its right to control the making of further appropriations. It is argued

[12] An acre-foot is the quantity of water required to cover an acre to a depth of one foot—43,560 cubic feet. See *Wyoming* v. *Colorado*, 259 U. S. 419, 458.

that such needed additional appropriations will be prevented because Wilbur proposes to store the entire unappropriated flow of the main stream of the Colorado River at the dam; that Arizona, and those claiming under it, will not be permitted to take any water from the reservoir except upon agreeing that the use shall be subject to the compact; that under the terms of the compact they will not be entitled to appropriate any water in excess of that to which there are now perfected rights in Arizona;[13] and that in order to irrigate land in Arizona it is frequently necessary to utilize rights of way over lands of the United States, and since the Act provides that all such

---

[13] The allegation is in substance this. Of the average annual flow of 18,000,000 acre-feet, the Act and compact permit the present final appropriation of only 15,000,000. This quantity must satisfy all existing appropriations as well as all future appropriations. Of these 15,000,000, one-half is apportioned to the so-called Upper Basin, which includes Utah, Colorado, Wyoming, and New Mexico. The remaining 7,500,000 acre-feet have been allotted to the so-called Lower Basin, which includes Arizona and parts of Nevada and California. Of the water thus allotted to the lower basin, 6,500,000 acre-feet have already been appropriated; and, under a contract made by Wilbur with the Metropolitan Water District of Southern California, the remaining 1,000,000 are to be diverted to it. Thus it is argued that consistently with the Act and compact, it will be impossible for Arizona to make any further appropriation, unless it be under the following provision. The compact provides that no part of the 3,000,000 acre-feet of the estimated annual flow, not now apportioned, shall be appropriated until after October 1, 1963, as such water may be required to satisfy rights of Mexico, through which country the river flows after leaving the United States. If the satisfaction of recognized Mexican rights reduces the unappropriated water below 1,000,000 acre-feet annually, the lower basin States may require the upper basin States to deliver from their apportionment, one-half of the amount required to meet the deficit. It is claimed that Arizona thus may use, but not legally appropriate, any unappropriated water which is available for use by it; and that this restricted right does not justify the expenditures necessary for putting the water to beneficial use in Arizona.

rights of way or other privileges to be granted by the United States shall be upon the express condition and with the express covenant that they shall be subject to the compact, the Act in effect .prevents Arizona and those claiming under it from acquiring such rights.

This contention cannot prevail because it is based not on any actual or threatened impairment of Arizona's rights but upon assumed potential invasions. The Act does not purport to affect any legal right of the State, or to limit in any way the exercise of its legal right to appropriate any of the unappropriated 9,000,000 acre-feet which may flow within or on its borders. On the contrary, section 18 specifically declares that nothing therein " shall be construed as interfering with such rights as the States now have either to the waters within their borders or to adopt such policies and enact such laws as they may deem necessary with respect to the appropriation, control, and use of water within their borders, except as modified " by interstate agreement. As Arizona has made no such agreement, the Act leaves its legal rights unimpaired. There is no allegation of definite physical acts by which Wilbur is interfering, or will interfere, with the exercise by Arizona of its right to make further appropriations by means of diversions above the dam or with the enjoyment of water so appropriated.[14] Nor any

---

[14] There is in the bill a further allegation that, under color of the Act, Wilbur has seized and taken possession of all that part of the Colorado River which flows in Arizona and on the boundary thereof, and of the water now flowing therein, and of all the dam sites and reservoir sites suitable for irrigation of the Arizona land and for the generation of electric power " and now has said river, said water and said sites in his possession; and has excluded and is now excluding the State of Arizona, its citizens, inhabitants, and property owners from said river, said water and said sites, and from all access thereto; has prevented and is now preventing said State, its citizens, inhabitants and property owners from appropriating any of said 8,000,000 acre-feet of unappropriated water . . ." But from other parts of

specific allegation of physical acts impeding the exercise of its right to make future appropriations by means of diversions below the dam, or limiting the enjoyment of rights so acquired, unless it be by preventing an adequate quantity of water from flowing in the river at any necessary point of diversion.

When the bill was filed, the construction of the dam and reservoir had not been commenced. Years must elapse before the project is·completed.˙ If by operations at the dam any then perfected right of Arizona, or of those claiming under it, should hereafter be interfered with, appropriate remedies will be available. Compare *Kansas v. Colorado,* 206 U. S. 46, 117. The bill alleges, that plans have been drawn and permits granted for the taking of additional water in Arizona pursuant to its laws. But Wilbur threatens no physical interference with these projects; and the Act interposes no legal inhibitions on their execution.[15] There is no occasion for determining

the bill and from the argument, it is clear that there has been no physical taking of possession of anything, and that Wilbur has not trespassed on lands belonging either to Arizona or any of its citizens. This allegation is thus merely a conclusion of law from the fact that Wilbur, in˙conformity with the provisions of the Act, has made plans for the construction of the dam and reservoir, promulgated regulations concerning the use of the water to be stored, and executed contracts for the use of some of it.

[15] It is also argued that of the 7,500,000 acre-feet allotted by the compact to the upper basin States, only 2,500,000 have already been appropriated, and that thus the presently unused surplus of 5,000,000 acre-feet cannot be appropriated in Arizona. But Arizona is not bound by the compact as it has withheld ratification. If and when withdrawals pursuant to the compact by the upper basin States diminish the amount of water actually available for use in Arizona, appropriate action may then be brought.

The allegation that the inclusion in the compact of the waters of the Gila River (all of which are said to have been appropriated in Arizona) operates to reduce the amount of water which may be taken by that State, can likewise be disregarded. Not being bound

now Arizona's rights to interstate or local waters which have not yet been, and which may never be, appropriated. *New Jersey* v. *Sargent*, 269 U. S. 328, 338. This Court cannot issue declaratory decrees. Compare *Texas* v. *Interstate Commerce Commission*, 258 U. S. 158, 162; *Liberty Warehouse Co.* v. *Grannis*, 273 U. S. 70, 74; *Willing* v. *Chicago Auditorium Assn.*, 277 U. S. 274, 289–90. Arizona has, of course, no constitutional right to use, in aid of appropriation, any land of the United States, and it cannot complain of the provision conditioning the use of such public land. Compare *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 403–05.

As we hold that the grant of authority to construct the dam and reservoir is a valid exercise of Congressional power, that the Boulder Canyon Project Act does not purport to abridge the right of Arizona to make, or permit, additional appropriations of water flowing within the State or on its boundaries, and that there is now no threat by Wilbur, or any of the defendant States, to do any act which will interfere with the enjoyment of any present or future appropriation, we have no occasion to consider other questions which have been argued. The bill is dismissed without prejudice to an application for relief in case the stored water is used in such a way as to interfere with the enjoyment by Arizona, or those claiming under it, of any rights already perfected or with the right of Arizona to make additional legal appropriations and to enjoy the same.

*Bill dismissed.*

MR. JUSTICE MCREYNOLDS is of the opinion that the motions to dismiss should be overruled and the defendants required to answer.

---

by the compact, Arizona has not assented to this inclusion of the Gila appropriations in the allotment to the lower basin; and there is no allegation that Wilbur or any of the defendant States are interfering with perfected rights to the waters of that river, which enters the Colorado 286 miles below Black Canyon.