# THE ATTORNEY GENERAL
# OF TEXAS
AUSTIN 11, TEXAS



Gerald C. Mann

~~XXXXXXXXXXXXXXX~~XXX

ATTORNEY GENERAL

Agricultural & Mechanical
College of Texas
College Station, Texas

Attention:  G. S. Fraps
State Chemist.

Opinion No. O-4617
Re:  Collection of inspection tax
on fertilizer distributed in Texas
by the Agricultural Adjustment
Administration.

Dear Sir:

You request an opinion of this Department on the question whether the inspection tax imposed by Texas law on commercial fertilizers sold in Texas may be collected from the Agricultural Adjustment Administration, which distributes in Texas to Texas farmers fertilizers purchased by it outside of Texas.

Texas Revised Criminal Statutes, 1925, Arts. 1709 through 1720, and Civil Statutes, Arts. 94 through 108, regulate the sale of commercial fertilizer within the State of Texas.  To defray expenses of inspection and enforcement of these regulatory laws, an inspection fee of 25¢ per ton is provided for commercial fertilizer "sold or exposed, or offered for sale in this State" by "all corporations, firms or persons".

The Agricultural Adjustment Administration is a federal agency or instrumentality.  From your letter and accompanying documents it appears that the A.A.A. is distributing to farmers in Texas commercial fertilizer purchased by the A.A.A. outside of Texas, in the following manner:  The farmer is furnished fertilizer on the basis of a price of so much per hundred pounds. To the extent of the quantity of fertilizer furnished the farmer at the stipulated price, when the farmer makes application for his Agricultural Conservation Payment the amount of fertilizer theretofore furnished to him by the A.A.A. is deducted from that payment.

This activity of the A.A.A. is authorized by 16 U.S.C. 1940 ed. 590h(b), which provides:

"(b)  Subject to the limitations provided in subsection (a) of this section, the Secretary shall have power to carry out the purposes specified in clauses (1), (2), (3), (4), and (5) of section 7(a) by making payments or grants of other aid to agricultural producers, including tenants and sharecroppers, in amounts determined by the Secretary to be fair and reasonable

in connection with the effectuation of such purposes during the year with respect to which such payments or grants are made, and measured by (1) their treatment or use of their land, or a part thereof, for soil restoration, soil conservation, or the prevention of erosion; (2) changes in the use of their land; (3) their equitable share, as determined by the Secretary, of the normal national production of any commodity or commodities required for domestic consumption; or (4) their equitable share, as determined by the Secretary, of the national production of any commodity or commodities required for domestic consumption and exports adjusted to reflect the extent to which their utilization of cropland on the farm conforms to farming practices which the Secretary determines will best effectuate the purposes specified in section 7 (a); or (5) any combination of the above. In arid or semiarid sections, (1) and (2) above shall be construed to cover water conservation and the beneficial use of water on individual farms, including measures to prevent run-off, the building of check dams and ponds, and providing facilities for applying water to the land. In determining the amount of any payment or grant measured by (1) or (2) the Secretary shall take into consideration the productivity of the land affected by the farming practices adopted during the year with respect to which such payment is made. In carrying out the provisions of this section in the continental United States, the Secretary is directed to utilize the services of local and State committees selected as hereinafter provided. The Secretary shall designate local administrative areas as units for administration of programs under this section. No such local area shall include more than one county or parts of different counties. Farmers within any such local administrative area, and participating or cooperating in programs administered within such area, shall elect annually from among their number a local committee of not more than three members for such area and shall also elect annually from among their number a delegate to a county convention for the election of a county committee. The delegates from the various local areas in the county shall, in a county convention, elect, annually, the county committee for the county which shall consist of three members who are farmers in the county. The local committee shall select a secretary and may utilize the county agricultural extension agent for such purpose. The county committee shall select a secretary who may be the county agricultural extension agent. If such county agricultural extension agent shall not have been elected secretary of

such committee, he shall be ex officio a member of the county committee. The county agricultural extension agent shall not have the power to vote. In any county in which there is only one local committee the local committee shall also be the county committee. In each State there shall be a State committee for the State composed of not less than three or more than five farmers who are legal residents of the State and who are appointed by the Secretary. The State director of the Agricultural Extension Service shall be ex officio a member of such State committee. The ex officio members of the county and State committees shall be in addition to the number of members of such committees hereinbefore specified. The Secretary shall make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees, of such programs. In carrying out the provisions of this section, the Secretary--shall, as far as practicable, protect the interests of tenants and sharecroppers; is authorized to utilize the agricultural extension service and other approved agencies; shall accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress and as will tend to promote efficient methods of marketing and distribution; shall not have power to acquire any land or any right or interest therein; shall, in every practicable manner, protect the interests of small producers; and shall in every practical way encourage and provide for soil-conserving and soil-rebuilding practices rather than the growing of soil-depleting crops. Rules and regulations governing payments or grants under this subsection shall be as simple and direct as possible, and, wherever practicable, they shall be classified on two bases: (a) Soil-depleting crops and practices, (b) soil-building crops and practices. Notwithstanding any other provision of law, in making available conservation materials consisting of seeds, seed inoculants, fertilizers, liming and other soil-conditioning materials, trees, or plants, or in making available soil-conserving or soil-building services, to agricultural producers under this subsection, the Secretary may make payments, in advance of determination of performance by the producers, to persons who fill purchase orders covering approved conservation materials or covering soil-conserving or soil-building services, furnished to producers at not to exceed a fair price fixed in accordance with regulations to be prescribed

<u>by the Secretary, or who render services to the Sec-
retary in delivering to producers approved conserva-
tion materials for the carrying out, by the produc-
ers, of soil-building or soil-conserving practices
approved by the Secretary.</u>  (16 U.S.C. 1940 ed.
590h(b).)"  (Emphasis ours)

The agricultural conservation program in which the
United States is engaged is designed to conserve the soil re-
sources of the U. S.  Section 8, clause 1, of the Constitution
of the U. S. confers upon the Congress the power "to lay and
collect taxes, duties, imposts, and excises, to . . . provide
for the . . . general welfare of the United States; . . ."
The power exercised by the Congress in the establishment of the
Soil Conservation Program is the power necessarily implied from
the power thus expressly conferred by the Constitution, to wit,
the right to expend the "taxes, duties, imposts, and excises"
collected for the purpose of promoting "the general welfare of
the United States".

It may well be doubted that the distribution of the
fertilizer in Texas by the A.A.A. constitutes a "sale", within
the purview of our State laws.  It would seem that the fertilizer
is "granted" to the farmer in advance of performance of the con-
ditions entitling him to a cash grant or payment; that the fer-
tilizer grant is in lieu of the cash grant, and that the price
or value of the fertilizer is established in order that the
amount of cash to be deducted from the cash grant or payment may
be determined.  Whether this constitutes a sale, within the mean-
ing of the Texas law, we find unnecessary to determine, for we
are of the opinion that, even though the transaction is a sale,
the inspection tax or fee cannot be collected from the Federal
agency.

It is a familiar principle, established since McCulloch
v. Maryland, 4 Wheat. 316 (U.S. 1819), that the States cannot
interfere with, burden, or impede the Federal government or its
authorized instrumentalities in the exercise of any of the pow-
ers vested by the Constitution of the United States in the Con-
gress of the United States.  The principle has been announced
most frequently in those cases involving an attempt to collect
a State tax from a Federal instrumentality.  It has, however,
equal application to the enforcement of State regulatory laws
against Federal instrumentalities.  Johnson v. Maryland, 254 U.S.
51; Hunt v. U.S., 278 U.S. 96; Arizona v. California, et al, 283
U.S. 423; Ohio v. Thomas, 173 U.S. 276; Easton v. Iowa, 188 U.S.
220; Ex parte Willman, 277 Fed. 819; Posey v. T.V.A., 93 F.(2)
726; United States v. Query, 21 Fed.Supp. 784.

The exaction presently involved is an inspection fee, rather than a tax. But whether it be a tax or an inspection fee, an exertion of the taxing power or of the police power of the State, it operates directly and immediately upon the Federal instrumentality in the exercise of the power conferred upon it by the Congress, and directly burdens the instrumentality in the exercise of that power. The agency of the United States is immune from and cannot be required to pay the fee or tax involved.

The fee or tax cannot be justified by reasoning that there is no real burden because the instrumentality might pass the fee or tax on to the farmer by increasing the price of the fertilizer, or might require those from whom it purchases the fertilizer outside of the State to comply with Texas regulations. With equal plausibility every State tax on Federal activities might be justified by the observation that no real burden exists because the amount of the State tax may be passed on by the Federal government through the collection of increased Federal taxes.

The situation here is not to be confused with the cases where the burden or regulation affects the Federal instrumentality only remotely or indirectly, as in the case where the tax or regulation operates directly upon a private person or corporation not an instrumentality or agent of the Federal government. See Alabama v. King & Boozer, 314 U.S. 1; James v. Dravo Contracting Co., 302 U.S. 134. Thus a private person, firm, or corporation selling commercial fertilizer to the Agricultural Adjustment Administration in Texas is subject to its laws; the fact that the sale is made to the Federal instrumentality does not clothe the vendor with the immunity possessed by the vendee.

Likewise, we are not to be understood as holding that employees of the United States and its agencies secure a general immunity from State laws while engaged in the performance of their duties. Such State regulations as affect only incidentally the mode of carrying out those duties may well apply to the employees of Federal instrumentalities (see Johnson v. Maryland, above); the immunity, however, does extend to those regulations which directly impede or burden the employee in the discharge of his Federal duties.

APPROVED JUL 13, 1942
/s/ Gerald C. Mann
ATTORNEY GENERAL OF TEXAS
APPROVED: OPINION COMMITTEE
BY:      BWB, CHAIRMAN
RWF:mp:wb

Yours very truly
ATTORNEY GENERAL OF TEXAS
By /s/ R. W. Fairchild
R. W. Fairchild, Assistant