**UNITED STATES of America,**
**Plaintiff,**

v.

**Edward M. CLARIDGE et al., Defendants.**

**State of Arizona ex rel. Obed M. Lassen,**
**Intervenor.**

**No. Civ–5080 Phx.**

United States District Court
D. Arizona.

Nov. 7, 1966.

Supplemental Judgment Sept. 25, 1967.

Richard S. Allemann, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff.

Robert Stafford, Claremont, Cal., and Richard F. Harless, Phoenix, Ariz., for defendants.

Darrell F. Smith, Atty. Gen., of Arizona, for intervenor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

CRAIG, District Judge.

The within action was instituted by the United States for the purpose of quieting title to certain land hereinafter described, to evict the defendant occupants of the land, and for damages claimed to have resulted from the use and occupancy of the land by the defendant occupants. The land in controversy is described as follows:

The South Half of the Southwest Quarter (S½SW¼) of Section 22; all of Section 27; The South Half of the Southeast Quarter of the Northeast Quarter (S½SE¼NE¼) of Section 28; and that part of Lot Three (3) lying West of the South Half of the Southeast Quarter of the Northeast Quarter (S½SE¼NE¼) of Section 28, Township Three North, Range Twenty-two West, G&SRB&M, Yuma County, Arizona.

The defendant occupants of the land deny the title of the United States and assert title to be in the State of Arizona, and that they, the defendant occupants, are properly in possession by virtue of certain leases executed by the State of Arizona. The defendant occupants also by way of set off and counterclaim assert that they have suffered damages in the loss of a barley crop and the destruction of certain improvements caused by the plaintiff in interfering with their occupancy.

The State of Arizona, intervenor, asserts title to the land upon the theory that the land in question is in fact located between the thread of the Colorado River and the easterly ordinary high water mark of the river, and since the admission to statehood in 1912, the State of Arizona has owned the land in question, and its title thereto has been confirmed by virtue of the Submerged Lands Act, 67 Stat. 29; 43 U.S.C. § 1301 et seq.

The defendant occupants prior to entering into the leases with the State of Arizona (which leases were executed subsequent to the commencement of this action), asserted their title to possession by virtue of a quit-claim deed from certain predecessors in interest, for which they had paid a substantial sum, and a land use permit acquired in 1963 from the United States Lower Colorado River Land Use Office, for which they had paid the sum of $2622.00.

The land in question is located in the Palo Verde Valley within the State of Arizona on the easterly side of the present channel of the Colorado River, approximately one and one-half miles south of Ehrenburg, Arizona. A portion of the land in question constituting a "corridor" through Section 28 abuts upon the easterly bank of the present river channel. Except for this area, the westerly border of the land in question is situated approximately one-fourth of a mile east of the present easterly bank of the river channel.

The Palo Verde Valley through which the Colorado River flows is a part of the overall natural basin of the Colorado River. The Valley is approximately fifteen miles in length from North to South, and at the point in question is approximately eight miles in width from East to West. The river flows generally in a northerly to southerly direction. The city of Blythe, California, is located in the Valley to the West of the River and the town of Ehrenburg, Arizona, is located in the Valley to the East of the River. The floor of the Valley is an alluvial plain which has obviously resulted from the deposit of alluvion by the Colorado River as it meandered across the Valley from one side to the other, and from the erosion of the bluff on the California side and the erosion of the bluff on the Arizona side. The westerly limit of the Valley is bounded by the California bluff; the easterly limit is bounded by the Arizona bluff.

The territory of which the land in question is a part was acquired by the

United States under the Treaty of Guadalupe Hildalgo. 9 U.S.Stat. 922.[1]

The Colorado River at the point in question is a navigable stream (State of Arizona v. State of Calif., 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; United States v. Appalachian Elec. Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243; Boulder Canyon Project Act, 45 U.S. Stat. 1057), and the State of Arizona holds title to land underlying the River from the thread of the stream to the easterly ordinary high water mark. (43 U.S.C. § 1301 et seq., 67 Stat. 29; State of Arizona v. State of Calif., 283 U.S. 423, 51 S.Ct. 522).[2]

Historically and prehistorically, the Colorado River has been, at its peak flow, a turbulent and violent river, carrying enormous quantities of water, and with the water, great quantities of silt and alluvion. Over the ages the deposit of the silt and alluvion by the river has resulted in the construction of the alluvial plain which constitutes the floor of the Valley. Since 1874, when attempts to measure the seasonal flow of the river and surveys were undertaken to establish its location, the meanderings of the river have been generally confined to the easterly side of the Valley, along the Arizona side or bluff.

By orders issued January 31, 1903 and February 19, 1929, pursuant to Act of Congress dated June 17, 1902 (32 Stat. 388), all public lands lying within six miles of the Colorado River east of the ordinary high water mark were withdrawn from settlement, entry or other disposition. Included in the withdrawal orders was that portion of the South Half (S½) of Township Three (3) North, Range Twenty-two (22) West, G&SRB&M, Yuma County, Arizona, lying east of the ordinary high water mark of the River. The land in question is included in the latter description,

unless it lies within the bed of the river between the easterly ordinary high water mark and the thread of the river to the west. The easterly border of the land in question is adjacent to federally owned land to the east.

A great amount of evidence was introduced for the purpose of showing the movements of the river from 1874 to 1964.

From 1874 to 1903, the river moved from a location considerably west of the lands in question to a position where it covered the "corridor" of these lands and a portion of the northwest area of the lands.

By 1912, at the time Arizona was admitted to statehood, the river had moved slightly more to the east toward the Arizona bluff.

Between 1911 and 1915, a levee was constructed along the westerly side of the flood plain of the river to protect agricultural land lying to the west of the river. During this period the "Rabb cut-off" was constructed, resulting in a partial avulsive movement of the river, which did not materially affect the lands in question. By 1915, however, the river had continued its easterly movement so that the normal flow of the river ran to the west of, but near the center of, the lands in question.

By 1922, a loop which had been forming to the north and west of the land in question had moved south and the river began to move westerly again, so that it covered the "corridor" and the southwest corner area of the land in question. By 1924, the loop had moved further south and the southeasterly extremity of the loop had moved easterly over the central portion of the lands, and the river continued to cover the "corridor"; it then flowed directly south through the center of the lands. As a result of the summer floods of 1924, the river had cut

---

1. Concluded February 2, 1848; Ratification exchanged at Queretaro, Mexico, May 30, 1848; Proclaimed July 4, 1848.

2. See also the "Equal Footing Doctrine", Pollard's Lessee v. Hagan, 3 How. 212,

11 L.Ed. 565; Shively v. Bowlby, 152 U. S. 1, 14 S.Ct. 548, 38 L.Ed. 331; State of Kansas v. State of Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956; and 37 U.S.Stat. 39; 37 U.S.Stat. 1738.

through the loop and the channel returned to approximately the same position it held in 1915. By 1930, the loop had reformed to the west and the river again cut back easterly into the lands in question so that it almost covered the southwest quadrant of the land.

The Boulder Canyon Project Act was passed by Congress in 1928, and among other things authorized the construction of a dam upstream from the land in question at Black Canyon or Boulder Canyon. There were several reasons for the construction of the dam, none of which was for the purpose of establishing the lands in question by avulsion. 43 U.S.C. § 617.[3] As a result of the Boulder Canyon Project Act, Hoover Dam was constructed. Its gates were closed and the dam became operative in 1935. Since that time until the present, the river channel has become relatively stabilized so that it flows adjacent to the westerly limits of the "corridor" of the lands in question and from one-half to one-quarter of a mile west of the lands other than the "corridor".

While it is posible to view the area in question and to generally determine the historical movements of the river there are little, if any, physical characteristics from which one might determine the classical "ordinary high water mark" of the river as it existed prior to 1935, nor is it in the opinion of the Court necessary to make such a determination to resolve the issues of this case.

The Court has considered the evidence in this case, the memoranda of the respective parties, and the arguments in support thereof. Being fully advised in the premises, the Court finds as follows:

## FINDINGS OF FACT

1. It is immaterial to determine the location of the ordinary high water mark of the river in 1912 or subsequent dates, other than the date at which defendants claim title or right to possession.

2. The present ordinary high water mark of the river exists by virtue of the controlled flow of the river through Hoover Dam and other dams upstream from the lands in question.

3. The lands in question are located to the east of the present ordinary high water mark of the Colorado River.

4. The lands in question were withdrawn from entry by the withdrawal orders of January 13, 1903 and February 19, 1929, issued pursuant to Act of Congress dated 17 June 1902, 32 Stat. 388.

5. The present ordinary high water mark of the Colorado River so far as it relates to the lands in question is within the existing banks of the river, the easterly such bank lying to the west of the most westerly limits of the land in question.

6. No part of the lands in question lie within the bed of the Colorado River from the thread of the river to its easterly bank, or otherwise.

---

3. SUBCHAPTER I.—BOULDER CANYON PROJECT ACT.
  § 617. Colorado River Basin; protection and development; dam, reservoir, and incidental works; water, water power, and electrical energy; eminent domain.
  For the purpose of controlling the floods, improving navigation and regulating the flow of the Colorado River, providing for storage and for delivery of the stored waters thereof for reclamation of public lands and other beneficial uses exclusively within the United States, and for the generation of electrical energy as a means of making the project herein authorized a self-supporting and financially solvent undertaking, the Secretary of the Interior, subject to the terms of the Colorado River compact hereinafter mentioned in this chapter, is hereby authorized to construct, operate, and maintain a dam and incidental works in the main stream of the Colorado River at Black Canyon or Boulder Canyon adequate to create a storage reservoir of a capacity of not less than twenty million acre-feet of water and a main canal and appurtenant structures located entirely within the United States connecting the Laguna Dam, or other suitable diversion dam, which the Secretary of the Interior is hereby authorized to construct if deemed necessary or advisable by him upon engineering or economic considerations, * * * etc. Dec. 21, 1928, c. 42, § 1, 45 Stat. 1057.

## CONCLUSIONS OF LAW

1. The ordinary high water mark of a river is a natural physical characteristic placed upon the lands by the action of the river. It is placed there, as the name implies, from the ordinary flow of the river and does not extend to the peak flow or flood stage so as to include overflow on the flood plain, nor is it confined to the lowest stages of the river flow.[4]

2. The ordinary high water mark of the Colorado River at the location in question is within the existing banks of the river to the west of the lands in question, regardless of the activity by the United States in constructing certain works within the river to confine and improve the channel, which work has been undertaken within the purview of the Boulder Canyon Project Act. 43 U.S.C. § 617 et seq.

3. The lands in question were established by accretion or reliction from the action of the Colorado River, or by both, and were accreted to or relicted to lands owned by the United States, withdrawn from entry by lawful action of the United States in 1903 and 1929; the title thereto is presently in the United States.[5]

4. The United States could not lose title to the lands in question by estoppel, mistake, laches, adverse possession or acquiescense.[6]

5. The defendants and intervenor have no right, title, interest, claim or demand to the lands in question.

6. If any finding of fact herein involves matters of both fact and law, to the extent that any such finding of fact may be construed more properly as a conclusion of law, the same is hereby adopted and incorporated herein as a conclusion of law.

This Court having decided the case upon the merits, plaintiff's motion for partial summary judgment heretofore taken under advisement is denied.

The Court will retain jurisdiction in the matter for the purpose of determining damages due plaintiff, if any, upon appropriate presentation of evidence on that subject.

Wherefore it is ordered, adjudged and decreed that title to the lands in question and described as:

The South Half of the Southwest Quarter (S½SW¼) of Section 22; all of Section 27; the South Half of the Southeast Quarter of the Northeast Quarter (S½SE¼NE¼) of Section 28; and that part of Lot Three (3) lying West of the South Half of the Southeast Quarter of the Northeast Quarter (S½SE¼NE¼) of Section 28, Township Three North, Range Twenty-two West, G&SRB&M, Yuma County, Arizona,

is in the United States of America, free and clear of any right, title, interest, claim or demand of defendants or intervenor.

## SUPPLEMENTAL JUDGMENT

This Court heretofore on November 4, 1966, entered its Findings of Fact, Conclusions of Law and Judgment in the above entitled cause. This Court retained jurisdiction for ultimate determination of the question of damages. The Judgment was not, therefore, a final and appealable judgment.

4. United States v. Chicago, B. & Q. R. Co., 7 Cir., 90 F.2d 161; State of Oklahoma v. State of Texas, 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428; See also Beaver v. United States, 9 Cir., 350 F.2d 4.

5. United States v. State of Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; United States v. State of Washington, 9 Cir., 294 F.2d 830, cert. den. 369 U.S. 817, 82 S.Ct. 828, 7 L.Ed.2d 783; Beaver v. United States, 9 Cir. 350 F.2d 4.

6. Art. IV, Section 3, Constitution; United States v. State of California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889; Beaver v. United States, 9 Cir., 350 F.2d 4; See Wilson & Co. v. United States, 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128; Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; United States v. Langendorf, 9 Cir., 322 F.2d 25.

Now upon motion of the defendants and intervenor, it is the opinion of this Court that the Findings of Fact, Conclusions of Law and Judgment hereinabove referred to involve questions of law as to which there are substantial grounds for difference of opinion, and that an immediate appeal from said Judgment may materially advance the ultimate determination of this litigation and other litigation.

It is adjudged that, subject to the provisions of Rule 73(a) (4) Federal Rules of Civil Procedure, for the reasons hereinabove set forth, said Judgment may be subject to appeal.