Whitaker, Judge,
dissenting:
The vice in the opinion of the majority stems from the concept embraced in this sentence from its opinion: “The State of Oklahoma owns the waters of the Grand Eiver, a non-navigable stream * * The State of Oklahoma did not “own” the waters of the stream; it merely had the right to regulate and control the use of them for the benefit of its citizens. “Ownership” by the state is a concept repugnant to the American theory of government; it is “contrary to *735 the genius of a free government.” Under the American system of government, natural resources belong, not to the state, but to the people. The state is not the overlord, doling out privileges to his underlings; it is the servant of the people, chosen by them to administer their common resources for the benefit of all, according to their respective rights. Its sole right is that of regulation and control.
But this right of one of the states of the Union is subject to the superior right of the United States to regulate and control the waters of the river, in the interest of navigation and purposes, related thereto. Because the United States had this superior right, it is not liable for the actions complained of.
That, in the opinion of the Chief Judge and me, is the essence of the case. If we are correct in our premise, there has been no taking of private property for public use for which the Fifth Amendment requires the payment of just compensation. Plaintiff, the state’s agent, of course has no greater right than its creator, the State of Oklahoma.
The issue presented is a clash in the exercise of the powers of two sovereignties — on the one hand, the power of the Federal Government, under the Commerce Clause of the Constitution, to use and control the waters of a non-navigable tributary of a navigable stream, in the interest of navigation on the navigable stream; and, on the other hand, the power of a state to use and control those waters for irrigation, the production of power or otherwise, in the interest of its citizens. If the powers of the Federal Government extend to the right of regulation and control of the waters of a non-navigable tributary of a navigable stream to the extent necessary to control and improve navigation on the navigable stream, its power to do so supersedes the power of the state to use and control the waters of this stream.
That the powers of the Federal Government do extend to the control and use of the waters of a non-navigable stream for the improvement of navigation on a navigable stream to which it is tributary is settled by Oklahoma v. Atkinson Co., 313 U.S. 508, 523. Wherever this power comes in conflict with state power, the state power must yield. It was so *736 held in Oklahoma v. Atkinson Co., supra. It had been so held long before in United States v. Rio Grande Irrigation Co., 174 U.S. 690. In that case the state sought to use the waters of the Rio Grande, far above the point where it was navigable, for irrigation, and had given the respondent the right to do so. The Supreme Court said the United States might enjoin such a use because it would interfere with the navigability of the river down stream. The Court said that the power of New Mexico to use those waters was “limited by the superior power of the General Government to secure the uninterrupted navigability of all navigable streams within the limits of the United States.” (Page 703.)
In Florida v. Mellon, 273 U.S. 12, 17, it was said: “Whenever the constitutional powers of the federal government and those of the state come into conflict, the latter must yield,” citing a number of cases.
In Oklahoma v. Atkinson Co., supra, the Federal Government had let a contract to respondent to erect a dam on the Red River some 500 miles above the point where it was navigable. Oklah<jma sought to enjoin the erection of the dam, insisting that it was beyond the constitutional power of Congress to build it, and that the building of it would interfere with the state’s own program for water development. In answer to the latter contention, the Supreme Court in an unanimous decision said, at pages 534 — 535:
And the suggestion that this project interferes with the state’s own program for water development and conservation is likewise of no avail. That program must bow before the “superior power” of Congress. United States v. Rio Grande Dam & Irrigation Co., supra, p. 703; New Jersey v. Sargent, 269 U.S. 328, 337; Arizona v. California, 298 U.S. 558, 569; United States v. Appalachian Power Co., supra.
This is in harmony with the purpose declared by Congress in the Federal Power Act, 49 Stat. 846, to assume priority in the control of such waters. In section 23(b) of this Act, it is prohibited that any dam should be constructed by any “person, association, corporation, state, or municipality” on such a non-navigable stream until it receives a license from the Federal Power Commission. The validity of this Act, *737 as so construed, was sustained by the Supreme Court in United States v. Appalachian Power Co., 311 U.S. 377.
When the Federal Government ousts the state government and takes control over the waters of the river, it has taken no property right of the Grand Eiver Dam Authority, an agency of the State of Oklahoma; it has merely exercised its right to erect a dam at this place, which was superior to the right of the State of Oklahoma to do so, and, hence, superior to the right of its agency to do so. In doing so, it did not take private property for public use for which it is required by the Constitution to pay just compensation.
When it decided to erect the dam the Federal Government did take certain lands, rights-of-way, and other easements that had been acquired by the Authority, but these have been paid for. The only thing that has not been paid for is the exclusion of Oklahoma and its agent from control and use of the waters of this river. The Federal Government having a superior right to use and control them, it does not have to pay the holder of a subordinate right for its exercise.
This necessarily follows from the holding in United States v. Rio Grande Irrigation Co., supra. As stated previously, that company undertook to appropriate all the unappropriated waters of the Eio Grande Eiver in the State of New Mexico, in which state the Eio Grande Eiver was non-navigable, but the Supreme Court held that the United States was entitled to an injunction to prevent this. If the United States may enjoin the appropriation of waters by a corporation authorized by a state to do so, the United States certainly does not have to pay the corporation for the deprivation of that right.
That case, if authority were needed, would seem to dispose of plaintiff’s claim for compensation for the taking of its right to erect a dam at this place and, by so doing, to utilize the water power of the river.
The majority comes to a different conclusion because they start with a false premise, that this was a taking of private property for public use.
Jones, Chief Judge, joins in the foregoing dissenting opinion.
*738 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastin G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The Grand River rises in Morris County, Kansas. It flows in a southeasterly direction to the vicinity of Wyan-dotte, Oklahoma, and then in a southerly direction until it joins the Arkansas River at a point not far from Muskogee, Oklahoma. The stream is known as the Neosho River in Kansas and as the Grand River in Oklahoma. (The Oklahoma designation will be used in the findings of fact, since this case involves an agency of the State of Oklahoma.) The Grand River is approximately 460 miles long and drains a total area of about 12,660 square miles. The principal towns in the watershed of the Grand River and its tributaries are Pittsburg, Parsons, Emporia, and Chanute in Kansas, Joplin and Neosho in Missouri, Miami and Vinita in Oklahoma, and Bentonville in Arkansas.
2. (a) The Grand River is a nomxavigable stream.
' (b) The Arkansas River, of which the Grand River is a tributary, is a navigable stream.
3. The first extensive studies on the feasibility of developing the lower Grand River for flood control and hydroelectric power purposes were completed in 1932 by the Army Corps of Engineers, an agency of the defendant. Possible dam and reservoir sites at Pensacola, Markham Ferry, and Fort Gibson on the Grand River were considered. A report relative to these studies was published in 1935 as House Document No. 308, 74th Congress, 1st Session. The report concluded that Federal development of the lower reaches of the Grand River was not economically justified at that time.
4. On April 26,1935, the State of Oklahoma enacted legislation (Session Laws of Oklahoma, 1935, Ch. 70, Art. 4, p. 350 et seq.) creating the Grand River Dam Authority (the plaintiff in this action) for the development of hydroelectric power on the Grand River.[1] The following statutory language was used in establishing the plaintiff:
*739 There is hereby created within the State of Oklahoma a conservation and reclamation district to be Known as “Grand River Dam Authority” (hereinafter called the District), and consisting of that part of the State of Oklahoma which is included within the boundaries of the Counties of Adair, Cherokee, Craig, Delaware, Mayes, Muskogee, Nowata, Ottawa, Rogers, Tulsa, Wagoner, Sequoyah, Osage, Washington, McIntosh, Creek, and Okmulgee. Such District snail be, and is hereby, declared to be a governmental agency and body politic and corporate, with the powers of government and with the authority to exercise the rights, privileges, and functions hereinafter specified, including the control, storing, preservation and distribution of the waters of the Grand River and its tributaries for irrigation, power and other useful purposes, the reclamation and irrigation of arid, semi-arid, and other lands needing irrigation, and the conservation and development of the forests, water and hydro-electric power of the State of Oklahoma.
5. Among the powers, rights, and privileges conferred upon the plaintiff by the legislation creating it were the following:
(a) To control, store and preserve, within the boundaries of the District, the water of Grand River and its tributaries for any useful purpose, and to use, distribute and sell the same within the boundaries of the District;
(b) To develop and generate water power and electric energy within the boundaries of the District;
* * * * *
(e) To acquire by purchase, lease, gift, or in any other manner, and to maintain, use and operate any and all property of any Kind, real, personal, or mixed, or any interest therein, within or without the boundaries of the District, necessary or convenient to the exercise of the powers, rights, privileges, and functions conferred upon it by this Act;
(f) To acquire by condemnation any and all property of any Kind, real, personal, or mixed, or any interest therein within or without the boundaries of the District necessary or convenient to the exercise of the powers, rights, privileges and functions conferred upon it by this Act, in the manner provided by general law with respect to condemnation;
*****
(i) To construct, extend, improve, maintain, and reconstruct, to cause to be constructed, extended, im *740 proved, maintained, and reconstructed, and to use and operate any and all facilities of any kind necessary or convenient to the exercise of sucli powers, rights, privileges and functions;
# $ * * *
(o) To borrow money for its corporate purposes and, without limitation of the generality of the foregoing to borrow money and accept grants from the United States of America, or from any corporation or agency created or designated by the United States of America, and, in connection with any such loan or grant, to enter into such agreements as the United States of America or such corporation or agency may require; and to make and issue its negotiable bonds for moneys borrowed * * *.
6. Following its establishment in 1935, the plaintiff undertook the preparation of a comprehensive plan for the storage and control of the waters of the Grand Eiver and its tributaries within the State of Oklahoma in order to make beneficial use of such waters for the development and generation of electric power and energy. By 1939, the plaintiff had developed a plan which contemplated the construction, maintenance, and operation by the plaintiff of three dam-and-reservoir projects on the Grand Eiver, with hydroelectric generating units at the several projects. All were to constitute a single system functioning under unified control. The first of these projects was to be constructed at Pensacola, the second downstream from Pensacola at Markham Ferry, and the third downstream from Markham Ferry at Fort Gibson. Under the plan, the Pensacola project was to provide the pi’incipal headwater and power storage, while the installations at Markham Ferry and Fort Gibson were to be “run of the river” plants. The plan contemplated that the water stored at Pensacola would be used three times for the generation of electric power and energy — first through the Pensacola unit, second through the Markham Ferry unit, and then through the Fort Gibson unit.
7. (a) While the preparation by the plaintiff of its comprehensive plan for the development of the water-power resources of the Grand Eiver was in progress, further consideration was being given to the feasibility of a Federal development in that stream. Pursuant to a declaration of policy by the Congress in 1936, the Corps of Engineers conducted an *741 investigation to determine the advisability of the construction by the defendant of three dams along the Grand River at Pensacola, Markham Ferry, and Fort Gibson. After public notice, a public hearing was held at Vinita, Oklahoma, on June 7, 1937. That meeting was called by the Corps of Engineers and was attended by various interested corporations, associations, private citizens, and officials of the State of Oklahoma and its agencies, including representatives of the plaintiff.
(b) At the hearing on June 7, 1937 mentioned in paragraph (a) of this finding, proposals for the construction by the defendant of three dams on the Grand River at Pensacola, Markham Ferry, and Fort Gibson were explained by representatives of the War Department.
(c) There was submitted at the hearing on June 7, 1937 a copy of a lengthy letter dated June 4, 1937 from the Director of the Division of Water Resources, Oklahoma Planning and Resources Board, an agency of the State of Oklahoma, to the District Office of the Corps of Engineers at Memphis, Tennessee, recommending the construction by the defendant of the three proposed projects at Pensacola, Markham Ferry, and Fort Gibson.
(d) At the hearing on June 7, 1937, the Chairman of the plaintiff’s Board of Directors read and filed a statement which declared (among other things) that:
The Grand River Dam Authority is ready to assume its responsibility. With the power given it by the Oklahoma State Legislature we can and will issue bonds to carry out the part of the program as required by the United States Government.
a. Provide without cost to the United States all lands, easements, and rights-of-way necessary for the construction of the projects, i. e., Pensacola, Marken [sic] Ferry, and Ft. Gibson Dams.
b. Hold and save the United States free from damages due to the construction works; to pay for all alterations to bridges, highways, railroads, pipelines, telephone and telegraph lines, and alterations to other existing improvements made necessary as a result of the construction.
c. Maintain and operate all the works after completion in accordance with regulations prescribed by the Secretary of War. *742 In so many words the Grand River Authority with its power to issue 15 million dollars worth of bonds, is ready at all times to cooperate with the government in construction of these dams. We can meet any requirement you make upon us. Gentlemen, we are Rarin’ to go, lets build the Grand River Dams.
(e) In a report which was published in 1939 as House Document No. 107, 76th Congress, 1st Session, the Corps of Engineers recommended the construction and operation by the defendant of three dam-and-reservoir projects on the Grand River at Pensacola, Markham Ferry, and Fort Gibson. It was proposed in the report that the three projects be operated as one coordinated system in the combined interest of flood control and power development.
8. (a) In the meantime, the plaintiff began the construction of its contemplated dam and reservoir at Pensacola in 1938. The construction of this project by the plaintiff was financed by the Public Works Administration, an agency of the defendant, which made a grant to the plaintiff in the amount of $8,500,000 and a loan to the plaintiff in the amount of $11,500,000.
(b) On May 12, 1939, the plaintiff was authorized by the Oklahoma State Legislature to issue bonds in the aggregate amount of $10,000,000 for the construction of the plaintiff’s proposed projects at Markham Ferry and Fort Gibson.
(c) On July 26, 1939, the plaintiff obtained from the Federal Power Commission, an agency of the defendant, a license (No. 1494) for the operation of its Pensacola project. This license contained the following provisions (among others):
Article 1. This license is issued for a period of fifty (50) years from January 1, 1939, and in consideration hereof and the benefits and advantages accruing hereunder to the Licensee, it is expressly agreed by the Licensee that the entire project, project area, and project works, as hereinafter designated and described, whether or not located in, on, or along said Grand River or upon reservations of the United States, shall be subject to all the terms and conditions of this license.
*743 Article 13. The Licensee is hereby authorized to operate the reservoir in such manner as to utilize storage space below elevation 745 for power production purposes but not to utilize any storage space above said elevation 745 for power production purposes except during periods when the reservoir is being operated for the control of floods. The storage capacity between elevations 745 and 755 shall be expressly reserved for the control of floods. The Licensee shall impound flood waters in the storage space between elevations 745 and 755, and release flood waters therefrom, when, as, and in the manner directed by the Secretary of War, or his authorized representative: provided, that the Licensee shall not be required to impound any water above elevation 750 until the United States has acquired the necessary flowage rights above that elevation.
Article 11¡,. Subject to the provisions of Article 13, the operation of the project by the Licensee, so far as such operation may affect the use, storage, and discharge from storage, of waters, shall at all times be subject to the control of the Secretary of War under such rules and regulations as he may prescribe in the interests of navigation and flood control, and subject to the control of the Commission under such rules and regulations as it may prescribe for the safety of the dam and for the protection of life, health, and property.
*****
Article 20. The Licensee shall interpose no objections to nor in any way prevent the use of water for domestic purposes by persons or corporations occupying lands of the United States under permit along or near any stream or body of water, natural or artificial, used by the Licensee in the operation of the project works.
❖ ' ‡ if: * *
Article 26. * * * The Licensee further agrees, on behalf of itself, its successors and assigns, that, in the event the project is taken over by the United States upon the termination of this license, as provided in Section 14 of the Act, or is transferred to a new licensee under the provisions of Section 15 of the Act, it will be responsible for and will make good any defect of title to or of right of user in any such project property which is necessary or appropriate or valuable and serviceable in the maintenance and operation of the project, and will pay and discharge or will assume responsibility for payment and discharge of all liens or incumbrances upon the project or project property created by said Licensee or created or incurred after the issuance of this license * * * .
*744 (d) The plaintiff completed the construction of its Pensacola project in 1940. When completed, the project had a storage capacity of approximately 1,680,000 acre-feet at a maximum power-pool elevation of 745 feet above mean sea level, additional storage for flood control of approximately 520,000 acre-feet at elevation 755 above mean sea level, and a hydroelectric power plant with an initial installation of 80,000 kilowatts (which has since been increased to 90,000 kilowatts).
(e) During the period 1939-1940, the plaintiff acquired lands, easements, and rights-of-way, and constructed transmission lines, substations, and facilities, for the connection and integration of its Pensacola project with its contemplated Markham Ferry and Fort Gibson units. The plaintiff also had surveys, plans, and specifications made for the construction of its proposed Markham Ferry and Fort Gibson units.
9. On June 24, 1941, the Secretary of War, in pursuance of the authority conferred on him by Articles 13 and 14 of the license issued by the Federal Power Commission in connection with the plaintiff’s Pensacola project (see finding 8 (c)), approved the following regulations to govern the operation of that project in the interest of flood control:
1. Whenever the elevation of the reservoir exceeds elevation 745, the discharge facilities shall be operated so as (a) to reduce as much as practicable the flood damage below the reservoir and (b) to limit the elevation of the reservoir to elevation 750.
2. The District Engineer, Engineer Department at Large, in charge of the locality shall advise the [Grand Biver Dam] Authority when inflow rates are anticipated which may raise the elevation of the pool above elevation 745, and the maximum rate of release allowable. The Authority shall then take such measures to increase the storage capacity of the reservoir available for the control of floods as are not inconsistent with the development of power.
3. The Authority shall inform the District Engineer daily, promptly after taking the morning observations, as to the elevation of the reservoir pool and the tail water, and the rates of release for the preceding 24 hours. Whenever the pool is above elevation 745 the Authority shall submit these reports by telegraph or *745 telephone as directed by the District Engineer, supplemented by such additional telegraphic or telephonic reports as may be required by the District Engineer in the interest of flood control.
10. In the Flood Control Act of August 18, 1941 (55 Stat. 638, 645), Congress (among other things) modified a previously approved comprehensive plan for flood control and other purposes in the Arkansas River Basin by incorporating in the plan the three dam-and-reservoir projects on the Grand River at Pensacola, Markham Ferry, and Fort Gibson recommended by the Corps of Engineers in 1939 (see finding 7 (e)). The appropriation of funds for the construction of such works (among others) was authorized.
11. On November 21, 1941, the defendant took possession of the plaintiff’s Pensacola project in accordance with the .provisions of Executive Order 8944 (6 F. R. 5947). Thereafter, the project was operated by the defendant for national defense purposes until September 1, 1946, when it was returned to the plaintiff by the defendant.
12. (a) While the plaintiff’s Pensacola project was being operated by the defendant for national defense purposes, plans were set in motion for the construction by the defendant of a dam and reservoir on the Grand River at Fort Gibson, in accordance with the congressional authorization mentioned in finding 10. A public hearing to consider the project was called and held by the Corps of Engineers at Muskogee, Oklahoma, on January 27, 1942.
(b) The Director of the Oklahoma Planning and Resources Board appeared at the hearing on January 27, 1942 and, on behalf of the Board, endorsed the proposal for the construction of a dam and reservoir at Fort Gibson by the defendant.
(c) Delay in the formulation of definite plans for the construction by the defendant of a dam-and-reservoir project at Fort Gibson was encountered because of the shortage of construction materials during World War II.
13. (a) In a letter dated December 24,1943 and addressed to the War Department, the plaintiff stated that it desired that its property interest in the waters of the Grand River be duly recognized in connection with the proposed con *746 struction of a Federal dam-and-reservoir project at Fort Gibson, and that it be paid just compensation for any appropriation of its water rights.
(b) In a reply dated January 6, 1944, the Chief of Engineers stated in part as follows:
* * * I am pleased to assure you that if and when the Fort Gibson project is constructed, the property owners affected will be paid just compensation for property taken, within the meaning of the Federal Constitution. However, this office does not consider that the action of the Oklahoma legislature in providing for the future development of the Fort Gibson site by the Grand River Dam Authority had the effect of creating property for which compensation must be paid by the Federal Government.
14. (a) In a letter dated September 25,1945 from the Governor of Oklahoma to the Chief of Engineers, it was stated ‘ (among other things) as follows:
Acting for the State of Oklahoma and in compliance with the requirements of Public Law 584 of the Seventy-eighth Congress, second session, I am pleased to approve the plans submitted for the comprehensive development of the Arkansas River in this State, subject, as you also recommend, to such modification as later study may find desirable.
The engineering and economic record of this report is complete and voluminous. I quite agree with your opinion that public benefits, especially from navigation, will greatly exceed the estimates of the report.
I congratulate you upon the part you have played in developmg this program and thank you for expediting its approval. It indicates a most worth-while development of the Arkansas Basin and forecasts prosperity and happiness for our people. I am unable to find words with which to express my commendation for your able and progressive leadership before and during the war in originating and developing this program * * *.
(b) The comprehensive plan mentioned in the letter of September 25,1945 from the Governor of Oklahoma included the proposed construction by the defendant of a dam and reservoir at Fort Gibson on the Grand River.
15. (a) A letter was written by the plaintiff to the Chief of Engineers on February 14,1946 relative to the anticipated *747 issuance by the Corps of Engineers of an invitation for bids on the construction of the Federal dam and reservoir at Fort Gibson. This letter stated (among other things) that:
The Authority now wishes to call your attention to the fact that the construction of this project by the Federal Government will not only take and appropriate the Authority’s water rights in Grand River but will appropriate and take other properties and rights of the Authority.
The letter further stated that the construction of the dam and reservoir at the Fort Gibson site by the Corps of Engineers would affect the property and rights of the plaintiff as follows:
1. The appropriation of lands, rights of way, easements, transmission lines and facilities, which the Authority has rightfully acquired and constructed for the purpose of connecting the Pensacola unit with the Markham’s Ferry and Fort Gibson units.
2. The appropriation and making beneficial use of the waters of Grand River for the generation, distribution and sale of hydroelectric power and energy to the exclusion of the Authority.
3. The taking and converting to the Government’s benefit of the vested property rights of the Authority in the Fort Gibson unit which were created by the construction and operation of the Pensacola dam and reservoir (head-water improvement), thereby preventing the Authority from utilizing said head-water benefits created by the Pensacola unit.
4. The taking of the Authority’s right and franchise to develop, generate, distribute and sell electricity and electric energy at the Fort Gibson unit.
(b) In a reply dated March 11, 1946 to the letter of February 14,1946 from the plaintiff, the Chief of Engineers stated (among other things) that he did not believe that it would be necessary for the defendant to pay compensation for the intangible rights claimed by the plaintiff in its letter. The Chief of Engineers further stated, however, that the obligation of the defendant to pay just compensation for any physical property of the plaintiff which might actually be taken for the proposed Fort Gibson project of the defendant was recognized.
*748 16. Thereafter, construction of a dam-and-reservoir project at Fort Gibson on the Grand River was begun by the Corps of Engineers on May 22, 1946, and was completed on June 15, 1950. Construction of a power house at the project was completed on June 30, 1953.
17. The Fort Gibson project was constructed by the defendant as an integral part of a comprehensive plan for the regulation of navigation, the control of floods, and the production of hydroelectric power on the Arkansas River, a navigable waterway, and its tributaries. The project has been operated to carry out these purposes.
18. (a) The defendant’s Fort Gibson dam is located on the Grand River at a point approximately 50 miles below the plaintiff’s Pensacola project, and near the site of the plaintiff’s contemplated Fort Gibson dam. It has at present an installed generating capacity of approximately 49,000 kilowatts, with provision to add additional generating capacity of 25,000 kilowatts in the future. The bottom of the power pool is at elevation 551 above mean sea level, and the top of the power pool is at elevation 554 above mean sea level. There is storage capacity between elevation 554 and elevation 582 that is reserved for the control of flood waters.
(b) The defendant’s Fort Gibson project is a “run of the river” project; i. e., its reservoir provides pondage sufficient for fluctuations of inflow only over short periods of time, with a maximum drawdown of not more than three feet. There is sufficient pondage, based on all flows out of. the plaintiff’s Pensacola project, to produce 9,000 kilowatts of continuous power for only 13 days. The production of power at Fort Gibson is dependent upon releases of water from the plaintiff’s Pensacola project.
19. (a) During the course of the construction by the defendant of its Fort Gibson project, a suit was instituted by the defendant in the United States District Court for the Northern District of Oklahoma [2] to condemn certain lands for use in connection with the project; Among the lands which the defendant was attempting to acquire by condemnation in that proceeding was a 70-acre tract be *749 longing tó the plaintiff. The plaintiff appeared in the condemnation proceeding and took the position that the Secretary of War, at whose request the suit had been instituted, lacked the authority to condemn its land. The court held against the plaintiff on this issue. Thereafter, the plaintiff filed with the court an application for a distribution of compensation with respect to the land in question.
(b) It became necessary for the defendant, in connection with the development of its Fort Gibson project, to acquire flowage rights over certain lands owned by the plaintiff, and to provide for the relocation of a transmission line operated by the plaintiff. An agreement providing for the conveyance by the plaintiff of flowage easements to the defendant, and the relocation of the plaintiff’s transmission line, was entered into between the defendant and the plaintiff on February 6, 1950. Under the agreement, the defendant paid to the plaintiff the sum of $210,140.80.
20. (a) In April 1954, the plaintiff sought to institute before the Federal Power Commission a proceeding against the defendant, the Secretary of the Army, and the Secretary of the Interior relative to the defendant’s Fort Gibson project. In its petition, the plaintiff alleged (among other things) that the defendant’s Fort .Gibson project, without the use and aid of the storage and headwater improvements of the plaintiff’s Pensacola project, was incapable of producing any firm electric power and energy; that through the use of the plaintiff’s storage and headwater improvements at the Pensacola project, the defendant was able to produce at its Fort Gibson project approximately 94,600,000 kwh of firm energy per year; and that since about May 1, 1953, the defendant had been operating its Fort Gibson project and had been making use of the plaintiff’s water storage and headwater improvements for the production and generation of electric power and energy, but had not paid or offered to pay to the plaintiff any compensation on account of such benefits. The plaintiff requested the Commission (among other things) to:
* * * make and enter an Order determining and fixing the reasonable and equitable annual charges to be paid to the licensee by the United States for the benefits accruing to the Fort Gibson Power Project from the li *750 censee’s storage and headwater improvements at its Pensacola Project * * * .
(b) In a letter dated June 11,1954 from the Secretary of the Federal Power Commission to the plaintiff, it was stated (among other things) as follows:
Section 10 (f) of the Federal Power Act does not provide for the assessment of headwater benefit charges to projects constructed and operated by the Federal government. Your petition is therefore not acceptable for filing and is returned herewith.
. (c) Thereafter, the plaintiff sought and obtained a review by the United States Court of Appeals for the Tenth Circuit of the action of the Federal Power Commission in rejecting the petition mentioned in this finding. In a decision dated July 12', 1957 (246 F. 2d 453), the Court of Appeals upheld the Commission’s action. Among other things, the court said (at p. 455) that Section 10 (f) of the Federal Power Act, as amended:
* * * does not vest in the Commission power or authority to assess charges against the Fort Gibson project for benefits received from the headwater facilities at the Pensacola site. The subsection makes specific reference to the United States as one entitled under certain circumstances to receive compensation for headwater benefits. But no specific reference is made to the United States as one liable for the payment of compensation for benefits of that kind. In view of the specific reference to the United States in one instance and the absence of any specific reference to it in the other, there is no basis upon which it can be inferred or implied that Congress intended or purposed to include the United States among the owners of non-licensed projects liable for payment of compensation for upstream benefits. * * *
(d) The plaintiff did not apply to the Supreme Court for a writ of certiorari in connection with the decision of the United States Court of Appeals for the Tenth Circuit mentioned in paragraph (c) of this finding. Therefore, the judgment of the Court of Appeals is a final judgment.
21.. (a) While the various events mentioned in findings 12-20 relative to the defendant’s Fort Gibson project were transpiring, the plaintiff was endeavoring to proceed with *751 the construction of its proposed project at Markham Ferry on the Grand River.
(b) On August 9,1946, the plaintiff filed with the Federal Power Commission an application for a preliminary permit under the Federal Power Act for a proposed hydroelectric development at Markham Ferry.
(c) By an order dated January 18, 1949, the Federal Power Commission dismissed the plaintiff’s application referred to in paragraph (b) of this finding. The reason given by the Commission for such action was that the Congress had authorized the construction of a Federal project at Markham Ferry (see finding 10).
(d) In the act of July 6, 1954 (68 Stat. 450), Congress further modified the comprehensive plan for the development of the water resources of the Arkansas River Basin, as previously approved and modified (see finding 10), so as to authorize the construction of the Markham Ferry project on the Grand River by the plaintiff. The act also authorized the appropriation of not to exceed $6,500,000 as a monetary contribution by the defendant for flood control storage in the Markham Ferry project, and then provided (among other things) :
* * * That the acceptance by the Grand River Dam Authority of the foregoing amount shall constitute the agreement of the Grand River Dam Authority to hold and save the United States free and harmless from all claims heretofore o.r hereafter asserted of whatever nature including hut not limited to acquisition of land, relocation, construction, operation and maintenance of the dam and reservoir * * * .
(e) By a letter dated August 12, 1954, the plaintiff again requested the Federal Power Commission to issue a license to it for the Markham Ferry project.
(f) In a letter dated August 19,1954 and addressed to the Corps of Engineers, the plaintiff requested that there be placed in the Federal budget for the ensuing fiscal year an item calling for the appropriation of the $6,500,000 authorized in the act of July 6,1954. The evidence does not show whether this sum has ever been appropriated by the Congress and made available to the plaintiff.
*752 (g) On June 22,1955, tbe Federal Power Commission issued an order granting to tbe plaintiff a license (No. 2183) for tbe construction and operation of tbe Markbam Ferry project.
22. (a) Among tbe terms and conditions of tbe license that was issued to tbe plaintiff by the Federal Power Commission for tbe.Markbam Ferry project were tbe following:
Article 1%. The operation of any navigation facilities which may be constructed as a part of or in connection with any dam or diversion structure constituting a part of the project works shall at all times be controlled by such reasonable rules and regulations in the interest of navigation, including tbe control of the level of the pool caused by such dam or diversion structure, as may be made from time to time by tbe Secretary of the Army. Such rules and regulations may include the construction, maintenance, and operation by the Licensee, at its own expense, of such lights and signals as may be directed by the Secretary of the Army.
Article 13. The United States specifically retains and safeguards the right to use water in such amount, to be determined by the Secretary of the Army, as may be necessary for the purposes of navigation on the navigable waterway affected; and the operations of the Licensee so far as they affect the use, storage, and discharge from storage of waters affected by the license, shall at all times be controlled by such reasonable rules and regulations as the Secretary of the Army may prescribe in the interest of navigation, and as the Commission may prescribe for the protection of life, health, and property, and in the interest of the fullest practicable conservation and utilization of such waters for power purposes and for other beneficial public uses, including recreational purposes; and the Licensee shall release water from the project reservoir at such rate in cubic feet per second, or such volume in acre-feet per specified period of time, as the Secretary of the Army may prescribe in the interest of navigation, or as the Commission may prescribe for the other purposes here-inbefore mentioned.
* ‡ # 4>
Article 17. * * * In the event the project is taken over by the United States upon the termination of the license, as provided in Section 14 of the Act, or is transferred to a new licensee under the provisions of Section 15 of the Act, the Licensee, its successors and *753 assigns will be responsible for and will make good any defect of title to or of right of user in any of such project property which is necessary or appropriate or valuable and serviceable in the maintenance and operation of the project, and will pay and discharge, or will assume responsibility for payment and discharge, of all liens or incumbrances upon the project or project property created by the Licensee or created or incurred after the issuance of the license * * *.
(b) Article 12 was deleted by an order of the Commission issued on December 13,1954.
(c) Article 13 was amended by an order issued by the Commission on December 13, 1954, and was amended again by an order issued by the Commission on March 22, 1957. As amended the second time, Article 13 reads as follows:
The United States specifically retains and safeguards the right to use water in such amount, to be determined by the Secretary of the Army, as may be necessary for the purposes of navigation on the navigable waterway affected; and the operations of the Licensee, so far as they effect the use, storage and discharge from storage of waters above the dead storage pool (dead storage pool being that portion of the pool which is not used for operational purposes), shall at all times be controlled by such reasonable rules and regulations as the Secretary of the Army may prescribe in the interest of navigation and flood control, and as the Commission may prescribe for the protection of life, health, and property, and in the interest of the fullest practicable conservation and utilization of such waters for power purposes and for other beneficial public uses, including recreational purposes; and the Licensee shall release water from the project reservoir above the dead storage pool at such rate in cubic feet per second, or such volume in acre-feet per specified period of time, as the Secretary of the Army may prescribe in the interest of navigation or flood control, or as the Commission may prescribe for the other purposes hereinbefore mentioned.
23. The Board of Directors of the plaintiff has never granted to the defendant, or to any department or agency thereof, any franchise, right, or privilege to develop and generate electric power and energy on the Grand River in Oklahoma, or any right, title, or interest in and to the waters of the Grand River for the production of electric power and *754 energy, or any right to control, supervise, conserve, and develop the water power at the Fort Gibson dam-and-reservoir project.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes ás a.matter of law that the plaintiff is entitled to recover, together with interest thereon, as part of just compensation and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 88(c).

 The statutory provisions quoted in findings 4 and 5 relative to the establishment and functions of the plaintiff have been amended in a number of respects since 1935. However, none of these amendments is especially significant from the standpoint of the present litigation.

 The style o£ the condemnation suit was united States y. 1,031.15 acres of land, more or less, situate In Mayes County, Oklahoma, and Ray Bonnella. Grand Riyer Dam Authority, et al. (No. 2116-Ciyil).