## NEW JERSEY *v.* SARGENT, ATTORNEY GENERAL, ET AL.

No. 20, Original. Submitted October 5, 1925.—Decided January 4, 1926.

1. A bill by a State for an injunction against federal officers charged with the administration of a federal statute can not be entertained by this Court, where the bill does not show that any right of the State which in itself is an appropriate subject of judicial cognizance, is being, or is about to be, affected prejudicially by the application or enforcement of the Act, but seeks merely to obtain a judicial declaration that, in certain features, the Act exceeds the authority of Congress and encroaches upon that of the State. P. 330.

2. The bill in this case, which seeks to draw in question the constitutionality of parts of the Federal Water Power Act in their relation to waters within or bordering on the complaining State, fails to present any case or controversy appropriate for exertion of the judicial power. P. 334.

3. The power of Congress to regulate interstate and foreign commerce includes the power to control, for the purposes of such commerce, all navigable waters accessible to it and within the United States, and to that end to adopt all appropriate measures to free such waters from obstructions to navigation and to preserve, and even enlarge, their navigable capacity; and the authority and rights of a State in respect of such waters within its limits are subordinate to this power of Congress. P. 337.

Bill dismissed.

ON a motion to dismiss a bill filed by the State of New Jersey, against the Attorney General of the United States and the members of the Federal Power Commission, all alleged to be citizens of other States, to enjoin the defendants from taking any steps to apply or enforce, in respect of waters within or bordering on New Jersey, certain provisions of the Federal Water Power Act.

*Messrs. Thomas F. McCran,* Attorney General, *William Newcorn* and *Harry R. Coulomb,* Assistant Attorneys General, of New Jersey, for complainant.

The bill presents a justiciable controversy. It alleges the State's proprietary interest in and over its water resources, from which it derives, and may expect, revenue of considerable magnitude; that the defendants claim the right under the Federal Water Power Act to license and control such water resources and to receive revenue therefrom by way of license fees and otherwise; threats on the part of the defendants to enforce the provisions of the Act, and that such enforcement irreparably affects the revenues of the State derived and to be derived from such sources. These allegations set forth a specific and concrete situation resulting in an irreparable injury to the State individually, and to its citizens in their property rights derived through grants by the State. *Pennsylvania* v. *West Virginia,* 262 U. S. 553; *Louisville, etc. R. R.* v. *Railroad Commissioners of Alabama,* 157 Fed. 944; *Waite* v. *Macy,* 246 U. S. 266. The defendants have threatened to exercise certain authority under an act which the complainant claims to be unconstitutional and which, if exercised, would result in irreparable injury.

The bill presents a controversy within the original jurisdiction of this Court. *Pennsylvania* v. *West Virginia,* 262 U. S. 591; *Heckman* v. *United States,* 224 U. S. 413; *United States* v. *New Orleans R. R.,* 248 U. S. 507; *Missouri* v. *Illinois, etc.,* 180 U. S. 208; *Kansas* v. *Colorado*

185 U. S. 125; 206 U. S. 46; *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230; *United States* v. *Rickert,* 188 U. S. 432; *Cohen* v. *Virginia,* 6 Wheat. 264.

The suit is not against the United States. *Truax* v. *Raich,* 239 U. S. 33; *Ex Parte Young,* 209 U. S. 123; *United States* v. *Lee,* 160 U. S. 196; *Kennington* v. *Palmer,* 255 U. S. 100; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605. The bill sets forth a cause of action against all of the defendants.

*Solicitor General Beck, Messrs. Robert P. Reeder,* Special Assistant to the Attorney General, *Lewis W. Call* and *J. F. Lawson* were on the brief for defendants.

Mr. Justice Van Devanter delivered the opinion of the Court.

This is a bill in equity brought in this Court by the State of New Jersey against the Attorney General of the United States and the members of the Federal Power Commission, all alleged to be citizens of other States, to obtain a judicial declaration that certain parts of the Act of June 10, 1920, called the Federal Water Power Act, c. 285, 41 Stat. 1063, are unconstitutional in so far as they relate to waters within or bordering on that State, and to enjoin the defendants from taking any steps towards applying or enforcing them, in respect of those waters. The defendants respond with a motion to dismiss on the grounds, among others, that the bill does not present a case or controversy appropriate for the exertion of judicial power but only an abstract question respecting the relative authority of Congress and the State in dealing with such waters. If this be a proper characterization of the bill the motion to dismiss must prevail, as a reference to prior decisions will show.

In *Georgia* v. *Stanton,* 6 Wall. 50, this Court had before it a bill by the State of Georgia challenging the power of Congress to enact the so-called Reconstruction Acts and

seeking an injunction against the Secretary of War and others to prevent them from giving effect to that legislation. On examining the bill the Court found that it was directed against an alleged encroachment by Congress on political rights of the State and not against any actual or threatened infringement of rights of persons or property; and on that ground the bill was dismissed. The nature and extent of the judicial power under the Constitution were much considered; the statement of Mr. Justice Thompson in *Cherokee Nation* v. *Georgia,* 5 Pet. 75,—" It is only where the rights of persons or property are involved, and when such rights can be presented under some judicial form of proceedings, that courts of justice can interpose relief. This court can have no right to pronounce an abstract opinion upon the constitutionality of a state law. Such law must be brought into actual or threatened operation, upon rights properly falling under judicial cognizance, or a remedy is not to be had here."—was quoted with approval; and the Court added: " By the second section of the third article of the Constitution ' the judicial power extends to all cases, in law and equity, arising under the Constitution, the laws of the United States,' etc., and as applicable to the case in hand, ' to controversies between a State and citizens of another State,'—which controversies, under the Judiciary Act, may be brought, in the first instance, before this Court in the exercise of its original jurisdiction, and we agree, that the bill filed, presents a case, which, if it be the subject of judicial cognizance, would in form, come under a familiar head of equity jurisdiction, that is, jurisdiction to grant an injunction to restrain a party from a wrong or injury to the rights of another, where the danger, actual or threatened, is irreparable, or the remedy at law inadequate. But, according to the course of proceeding under this head in equity, in order to entitle the party to a remedy, a case must be presented appropriate

for the exercise of judicial power; the rights in danger, as we have seen, must be rights of persons or property, not merely political rights, which do not belong to the jurisdiction of a court, either in law or in equity."

In *Marye* v. *Parsons,* 114 U. S. 325, an owner of coupons cut from bonds of the State of Virginia issued with a guaranty that the coupons should be receivable in payment of taxes, brought a bill in equity in a federal court in that State against the tax collectors to compel them to recognize the guaranty and to disregard later statutes forbidding acceptance of such coupons in payment of taxes. The coupons were overdue, the State had made default in their payment, and the tax collectors had announced a general purpose to follow the subsequent statutes. The coupons were transferrable and could be sold at nearly their face value to other persons who had taxes to pay, provided the plaintiff obtained a decree adjudging the subsequent statutes invalid and directing the collectors to accept the coupons when tendered in payment of taxes by any lawful holder. Indeed, an arrangement to sell the coupons on these terms had been effected before the bill was filed. But no one was then in a position to tender the coupons to the tax collectors, because the plaintiff who owned the coupons had no tax to pay, and because the prospective transferees, while having taxes to pay, did not as yet own the coupons. The bill set forth the situation just described and prayed a decree along the lines suggested. In the court of first instance the plaintiff obtained a decree, but this Court reversed it and directed a dismissal of the bill for want of jurisdiction, saying:

"The bill as framed, therefore, calls for a declaration of an abstract character, that the contract set out requiring coupons to be received in payment of taxes and debts due to the State is valid; that the statutes of the General Assembly of Virginia impairing its obligations are con-

trary to the Constitution of the United States, and therefore void; and that it is the legal duty of the collecting officers of the State to receive them when offered in payment of such taxes and debts.

"But no court sits to determine questions of law *in thesi.* There must be a litigation upon actual transactions between real parties, growing out of a controversy affecting legal or equitable rights as to person or property. All questions of law arising in such cases are judicially determinable. The present is not a case of that description."

In *Muskrat* v. *United States,* 219 U. S. 346, the question was whether, consistently with the limitations of the judicial power, this Court could entertain, on an appeal from the Court of Claims, a suit brought under a permissive Act of Congress by members of the Cherokee Tribe of Indians to determine the constitutional validity of congressional enactments enlarging prior restrictions on the alienation of their allotments and permitting newlyborn children and other members of the tribe omitted from a prior enrollment to share in the distribution of tribal lands and funds. In an extended opinion the Court pointed out that the suit did not present an actual controversy between the parties respecting any specific right of person or property, but only a question of the power of Congress to enact the legislation described, and held that such a suit was not within the scope of the judicial power and could not be entertained by this Court, originally or on appeal, even under a permissive Act of Congress.

In *Texas* v. *Interstate Commerce Commission,* 258 U. S. 158, where a bill praying that an act enlarging the powers of the Interstate Commerce Commission and creating the Railroad Labor Board be declared unconstitutional and action thereunder prevented by injunction was dismissed for want of jurisdiction, this Court said:

" The bill is of unusual length, sixty-five printed pages. Much of it is devoted to the presentation of an abstract question of legislative power—whether the matters dealt with in several of the provisions of Titles III and IV fall within the field wherein Congress may speak with constitutional authority, or within the field reserved to the several States. The claim of the State, elaborately set forth, is that they fall within the latter field, and therefore that the congressional enactment is void. Obviously, this part of the bill does not present a case or controversy within the range of the judicial power as defined by the Constitution. It is only where rights, in themselves appropriate subjects of judicial cognizance, are being, or are about to be, affected prejudicially by the application or enforcement of a statute that its validity may be called in question by a suitor and determined by an exertion of the judicial power."

And in *Massachusetts v. Mellon*, 262 U. S. 447, the Court recognized and gave effect to the reasoning and principle of those cases by dismissing a bill brought by the Commonwealth of Massachusetts to restrain executive officers from giving effect to an act of Congress alleged to be an unconstitutional usurpation of power, but not shown to affect prejudicially any proprietary or other right of the State subject to judicial cognizance.

On reading the present bill we are brought to the conclusion, first, that its real purpose is to obtain a judicial declaration that, in making certain parts of the Federal Water Power Act applicable to waters within and bordering on the State of New Jersey, Congress exceeded its own authority and encroached on that of the State, and secondly, that the bill does not show that any right of the State, which in itself is an appropriate subject of judicial cognizance, is being, or about to be, affected prejudicially by the application or enforcement of the Act. We think the reasons for this conclusion will be

indicated sufficiently by describing the Act and then pointing out the distinctive features of the bill.

The Act is a long one, extends to all the States and organized Territories and the District of Columbia, and varies its operation according to local situations and conditions. Some of its provisions are general, some relate to areas containing public and Indian lands, and some have special application to the use of government dams in developing power. As respects the State of New Jersey, the Act may be adequately described for present purposes by stating that it relates particularly to navigable waters; subjects their improvement and utilization for purposes of navigation and developing power to stated restrictions and supervision by a public commission, which it creates; requires that such operations be carried on under preliminary permits and long-term licenses obtained from the commission and conditioned on compliance with the restrictions; provides that no license "affecting the navigable capacity of any navigable waters" shall be issued until the plans of the dam or other structures affecting navigation have been approved by the Chief of Engineers and the Secretary of War; directs that preference be given to applications by the State or any municipality; requires that each applicant for a license to use the waters for power purposes submit satisfactory evidence of his compliance with the laws of the State and of his right to engage in such business; prescribes that licensees shall pay to the United States reasonable annual charges, to be fixed by the commission, for the purpose of reimbursing the United States for the cost of administering the Act, " and for the expropriation to the Government of excessive profits until " the State " shall make provision for preventing excessive profits or the expropriation therefor [thereof] to " itself, but relieves the State and any municipality from the payment

of any charge in respect of licenses for power purposes where the power is sold without profit or used for public purposes, and also in respect of licenses for projects primarily designed to improve navigation; and provides that any person or corporation, including the State or any municipality, intending to construct a dam or other works in a stream not declared navigable "may in their discretion" file a declaration of their intention with the commission, whereupon it shall by investigation ascertain whether "the interests of interstate or foreign commerce" will be affected thereby, that if it finds they will be affected the construction shall not proceed unless a license is sought and obtained, and that if it finds the other way the construction may proceed without a license. Some provisions relate particularly to the development of power, some only to improvement of navigation, and others to both, but all taken together suggest, if they do not show, that conservation for the purposes of navigation is a leading object. Thus it is said, in § 9(a), that every licensed project must be "adapted to a comprehensive scheme of improvement and utilization for the purposes of navigation, of water-power development, and of other beneficial uses," and, in § 10(c), that the licensee "shall so maintain and operate said works as not to impair navigation." One provision declares that nothing in the Act shall be construed as affecting or interfering with the laws of the State relating to the "control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." There are also provisions making it a misdemeanor, punishable by a fine of not exceeding $1,000, for any licensee, or any person, wilfully to fail or refuse to comply with any provision of the Act, condition of a license, or regulation or order of the commission,—and other provisions authorizing the Attorney General, on the recommendation of the commission or the Secretary of

War, to bring suits to prevent, remedy or correct violations of the Act or lawful regulations or orders thereunder, and also suits to revoke permits or licenses for violations of their terms.

Rightly to appraise the bill one should have in mind the doctrine, heretofore firmly settled, that the power to regulate interstate and foreign commerce, which the Constitution vests in Congress, includes the power to control, for the purposes of such commerce, all navigable waters which are accessible to it and within the United States, whether within or without the limits of a State, and to that end to adopt all appropriate measures to free such waters from obstructions to navigation and to preserve and even enlarge their navigable capacity; and that the authority and rights of a State in respect of such waters within its limits, and in respect of the lands under them, are subordinate to this power of Congress. *Philadelphia v. Stimson,* 223 U. S. 605, 634–638; *United States v. Chandler-Dunbar Co.,* 229 U. S. 53, 62–65; *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82, 88; *Greenleaf Lumber Co.* v. *Garrison,* 237 U. S. 251, 258, *et seq.; Willink* v. *United States,* 240 U. S. 572, 580; *United States v. Rio Grande Irrigation Co.,* 174 U. S. 690, 703.

The bill is directed against many provisions of the Act, especially those requiring permits and licenses and subjecting licensees to various restrictions and conditions and those relating to projects for utilizing the waters in the development of power; and it directly alleges that they all go beyond the power of Congress and impinge on that of the State. Plainly these allegations do not suffice as a basis for invoking an exercise of judicial power.

The bill further alleges, in an indefinite way, that " it is the intention " of the State to utilize the Morris Canal, which it recently has acquired, for " water power development " and in the " conservation of potable waters "; that there are " opportunities " for developing water

80048°—26——22

power at several places along streams which feed the canal and in designated localities along the Delaware River "where dams could be erected and power developed"; that the State "contemplates" utilizing these opportunities "through a state agency or by private enterprise" with a resulting profit to its treasury; that the State has an established policy respecting "the conservation of potable waters" which has been put into partial effect "through its agencies and by private enterprise" by means of reservoirs and water works constructed at large cost; and that in its sovereign capacity the State owns lands under the Bay of New York, the Hudson River, adjacent waters, and the Delaware River, from the leasing of which for dock, pier and related purposes it derives a large revenue. These allegations are followed by others, similarly indefinite, to the effect that the challenged provisions of the Act, if applied and enforced, will interfere with the State's contemplated development of "the aforesaid power projects," will jeopardize its policy respecting the conservation of potable waters and work serious injury to reservoirs and water works constructed and used in that connection, will deprive the State of revenue from the leasing of its submerged lands and from the development and conservation of water resources, and will subject the State and its citizens to onerous restrictions and conditions not required for the protection or promotion of navigation or of interstate or foreign commerce.

There is no showing that the State is now engaged or about to engage in any work or operations which the Act purports to prohibit or restrict, or that the defendants are interfering or about to interfere with any work or operations in which the State is engaged. If the use of particular waters in connection with the Morris Canal or with any reservoirs and water works, before the Act was passed, gave rise, as the bill suggests, to a right to continue such use, the Act does not purport to disturb, but rather to rec-

ognize, that right; and there is no showing that the defendants are taking or about to take any steps to prevent the State from exercising it. Passing that right, the State is merely shown to be contemplating power development and water conservation in the future. There is no showing that it has determined on or is about to proceed with any definite project. Neither is it shown that the defendants are now taking or about to take any definite action respecting waters bordering on or within the State, save as the commission is about to consider and act on "various applications from persons in New Jersey" for preliminary permits and licenses to utilize "navigable waters on the boundary and inland" for the development of water power. As the applications are not further described, it must be assumed that the permits are sought, as the Act provides, "for the sole purpose of maintaining priority of application for a license," and that the licenses are sought conformably to the provision requiring applicants to submit satisfactory evidence of compliance with the laws of the State with respect to "the appropriation, diversion and use of water for power purposes" and to "the right to engage in" that business. While the State is thus apparently put in the position of objecting to the licensing of projects sanctioned by its own laws, the bill explains that the objection is chiefly to the restrictions and conditions to which, according to the terms of the Act, an applicant is deemed to assent by seeking and accepting a license. These restrictions and conditions are assailed in the bill as passing beyond the field of congressional power and invading that reserved to the State. But whether they are thus invalid cannot be made the subject of judicial inquiry until they are given or are about to be given some practical application and effect. Naturally this will be after they become part of an accepted license, and after some right, privilege, immunity or duty asserted under them becomes the subject of actual con-

troversy. Such a situation is not presented here. As respects the State's submerged lands, the bill signally fails to disclose any existing controversy within the range of the judicial power. Stating merely that the State will be deprived of revenue from the leasing of such lands is not enough. Facts must be stated showing that the Act is being or about to be applied in a way which does or will encroach on or prejudicially affect the State's qualified right in the lands. There is no such showing.

The State places some reliance on *Pennsylvania* v. *West Virginia,* 262 U. S. 553. But in this it overlooks important factors in that decision. Two bills substantially alike—one by Pennsylvania and the other by Ohio—were considered. Both were brought to prevent the enforcement of a West Virginia statute restricting the carrying of natural gas from that State into others. The gas had been for several years carried in large and continuous volume through pipe lines into Pennsylvania and Ohio, and those States had come to be largely dependent on it as a fuel for public institutions and otherwise. The statute, in its first section, imposed on the pipe-line carriers an unconditional and mandatory duty (opinion p. 593), which if respected would largely prevent this supply of fuel from moving into Pennsylvania and Ohio and would subject those States to great loss. The bills disclosed that the situation when they were brought was such that the statute directly and immediately would effect a serious diminution of the volume of gas carried into the complaining States, and on which they were dependent (p. 594). Of the cases thus presented the Court said:

"Each suit presents a direct issue between two States as to whether one may withdraw a natural product, a common subject of commercial dealings, from an established current of commerce moving into the territory of the other. The complainant State asserts and the de-

fendant State denies that such a withdrawal is an interference with interstate commerce forbidden by the Constitution. This is essentially a judicial question. It concededly is so in suits between private parties, and of course its character is not different in a suit between States.

"What is sought is not an abstract ruling on that question, but an injunction against such a withdrawal presently threatened and likely to be productive of great injury. The purpose to withdraw is shown in the enactment of the defendant State before set forth and is about to be carried into effect by her officers acting in her name and at her command."

This bill falls far short of showing a situation like that presented there, and what it does show falls on the other side of the jurisdictional line.

Our conclusion is that the bill cannot be entertained.

*Bill dismissed.*