Application of the **PRESIDENT AND DI-RECTORS OF GEORGETOWN COL-LEGE, INC.**, a Body Corporate.

Misc. No. 2189.

United States Court of Appeals
District of Columbia Circuit.

Feb. 3, 1964.

Certiorari Denied June 15, 1964.
See 84 S.Ct. 1883.

Rehearing en banc denied, 118 U.S.
App.D.C., ——, 331 F.2d 1010.

Messrs. Edward Bennett Williams and Peter R. Taft, Washington, D. C., were

on the pleadings for applicant President and Directors of Georgetown College, Inc.

Before J. SKELLY WRIGHT, Circuit Judge, in Chambers.

J. SKELLY WRIGHT, Circuit Judge.

Attorneys for Georgetown Hospital applied [1] for an emergency writ at 4:00 P.M., September 17, 1963, seeking relief from the action of the United States District Court for the District of Columbia denying the hospital's application for permission to administer blood transfusions to an emergency patient.[2] The ap-

1. The text of the document embodying the application read:

"In re: APPLICATION OF THE PRESIDENT AND DIRECTORS OF GEORGE-TOWN COLLEGE, INC., A BODY CORPORATE

"This cause having come on to be heard upon application of The President and Directors of Georgetown College, Inc., a body corporate, owning and operating Georgetown University Hospital, and it being represented by counsel for the applicant that a Mrs. Jesse E. Jones is presently a patient at Georgetown University Hospital and that she is in extremis and it being further represented that the physician in attendance, the chief resident at Georgetown University Hospital, Edwin Westura, is of the opinion that blood transfusions are necessary immediately in order to save her life and it being further represented by the applicant that consent to the administration thereof can be obtained neither from the patient nor her husband; it is therefore

"ORDERED that the applicant acting through its duly accredited and licensed physicians in attendance may administer such transfusions as are in the opinion of the physicians in attendance necessary *to save her life.*"

2. The initial papers set out in Note 1, *supra,* had been presented to the District Court, Tamm, J., in chambers. These papers may well be taken as a complaint in a civil action in the nature of a petition or application in equity, Rules 3 and 8(f), F.R.Civ.P. Under Rule 5(e), F.R. Civ.P., "the judge may permit the papers to be filed with him" instead of the clerk. "[U]nder this provision when ·it is necessary for a party to obtain immediate

court action which would be delayed by first filing papers with the clerk, a party may file his papers with the judge, if the latter permits such filing, and obtain such order as the judge deems proper. A typical instance for effective use of this subdivision is where the plaintiff seeks a restraining order and would be delayed by first filing a complaint with the clerk and then going to a judge * * * [T]he plaintiff may file his complaint with the judge and obtain a restraining order immediately." 2 Moore, Federal Practice ¶ 5.11 at 1357 (2d ed. 1962) ; see also 2 *id.* ¶ 3.03 at 712.

Though the papers may be irregular in form, in substance they perform the office of a complaint, indicating the nature of the matter in dispute, the grounds of jurisdiction, and the relief sought. Rule 8(a) and (f), F.R.Civ.P. Defects in the complaint are not fatal under the Rules, certainly where the deficiency is explained by lack of time or skill or the like. Compare Dioguardi v. Durning, 2 Cir., 139 F. 2d 774 (1944) ; 1A Barron & Holtzoff, Federal Practice and Procedure § 255 (Wright ed. 1960). In any case, it is well settled that shortcomings in the complaint are matters for challenge by motion, and do not go to jurisdiction. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 13 A.L.R. 2d 383 (1946) ; Baker v. Carr, 369 U.S. 186, 200, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Even "the lack of a complaint is not jurisdictional and * * * when there has been no timely objection, a valid judgment may properly be entered in such an informal litigation." 2 Moore, Federal Practice ¶ 3.04 at 719. In Engineers Ass'n v. Sperry Gyroscope Co., etc., 2 Cir., 251 F.2d 133, 135 (1957), cert. denied,

plication recited that "Mrs. Jesse E. Jones is presently a patient at Georgetown University Hospital," "she is in extremis," according to the attending physician "blood transfusions are necessary immediately in order to save her life," and "consent to the administration thereof can be obtained neither from the patient nor her husband."[3] The patient and her husband based their refusal on their religious beliefs as Jehovah's Witnesses. The order sought provided that the attending physicians "may" administer such transfusions to Mrs. Jones as might be "necessary to save her life." After the proceedings detailed in Part IV of this opinion, I signed the order at 5:20 P.M.[4]

## I.

Initially, it may be well to put this matter into fuller legal context, including "the nature of the controversy, the relation and interests of the parties, and the relief sought in the instant case."[5] The application was in the nature of a petition in equity to the United States District Court for the District of Columbia, a court of general jurisdiction. Though not fully articulated therein, the application sought a decree in the nature of an injunction and declaratory judgment[6] to determine the legal rights and liabilities between the hospital and its agents on the one hand, and Mrs. Jones and her husband on the other. Mrs. Jones subsequently appeared in the cause, in this court, as respondent to the application.

356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958), where a proceeding was commenced by petition and motion, without objection in the District Court to the absence of a complaint, the cause was held to be properly before the court.

It does not appear whether or not counsel intended to file new or amended pleadings articulating in more formal terms the nature of the relief demanded, e. g., declaratory judgment. The patient's rapid recovery may have led both the hospital and the patient to abstain from taking subsequent action in the District Court. The patient, Mrs. Jones, did file a motion for rehearing en banc in this court, asking this court to declare the rights of the parties inter se. See Note 8, infra.

3. The additional representations of the doctors on duty, made orally during consideration of the order, were thereafter reduced to writing in affidavit form and filed.

4. See Note 1, supra. The phrase "to save her life" was added to the last sentence of the original application. A memorandum order entered at the same time read as follows:

"The applicant having appeared before me for the issuance of a writ permitting the applicant to administer such transfusions as are in the opinion of the physicians in attendance necessary to save the life of Mrs. Jesse E. Jones and it appearing that on September 17, 1963, the District Court denied such application; and a hearing having been conducted before me at which all the interested parties were present and upon due consideration

had thereon, I signed, pursuant to the provisions of Section 1651, Title 28, United States Code, the attached order granting such relief which counsel had presented to the District Court Judge and which had been denied by him, it is therefore

"ORDERED that the Clerk of this court is hereby directed to file this memorandum order and attachment."

5. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L. Ed. 617 (1937).

6. See the Declaratory Judgments Act, 28 U. S.C. §§ 2201, 2202; see also Rule 57, F.R. Civ.P. "[A] party to a contract is not compelled to wait until he has committed an act which the other party asserts will constitute a breach, but may seek relief by declaratory judgment and have the controversy adjudicated in order that he may avoid the risk of damages or other untoward consequence." Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp., 10 Cir., 190 F.2d 985, 989 (1951). Put more generally, the Declaratory Judgments Act allows "prospective defendants to sue to establish their nonliability." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 504, 79 S.Ct. 948, 953, 3 L.Ed. 2d 988 (1959). And "it is not essential that there be a direct threat of litigation [by another] in order to invoke the Declaratory Judgment Act. It is sufficient if such a threat is implicit in the attitude of the [other] * * *." Simmonds Accessories v. Elastic Stop Nut Corp., 3 Cir., 257 F.2d 485, 490 (1958). See also Note 9, infra.

The treatment proposed by the hospital in its application was not a single transfusion, but a series of transfusions. The hospital doctors sought a court determination before undertaking either this course of action or some alternative. The temporary order issued was more limited than the order proposed in the original application, in that the phrase "to save her life" was added, thus limiting the transfusions in both time and number. Such a temporary order to preserve the life of the patient was necessary if the cause were not to be mooted by the death of the patient.

At any time during the series of transfusions which followed, the cause could have been brought on for hearing by motion before the motions division of this court,[7] and the order either vacated, continued, or superseded by an order of a more permanent nature, such as an interlocutory injunction. Neither the patient, her husband, nor the hospital, however, undertook further proceedings in this court or in the District Court during the succeeding days while blood was being administered to the patient.[8]

II.

That a "case or controversy" existed in the District Court, and before this court, seems clear under the tests laid down by the Supreme Court:

"A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. United States Bank, 9 Wheat. 738, 819 [6 L. Ed. 204]. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v.

Alaska S.S. Co., 253 U.S. 113, 116 [40 S.Ct. 448, 64 L.Ed. 808]. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. South Spring Gold Co. v. Amador [Medean] Gold [Mining] Co., 145 U.S. 300, 301 [12 S.Ct. 921, 36 L.Ed. 712]; Fairchild v. Hughes, 258 U.S. 126, 129 [42 S.Ct. 274, 66 L.Ed. 499]; Massachusetts v. Mellon, 262 U.S. 447, 487, 488 [43 S.Ct. 597, 67 L.Ed. 1078]. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. See Muskrat v. United States, supra [219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246]; Texas v. Interstate Commerce Comm'n, 258 U.S. 158, 162 [42 S.Ct. 261, 66 L. Ed. 531]; New Jersey v. Sargent, 269 U.S. 328, 339, 340 [46 S.Ct. 122, 70 L.Ed. 289]; Liberty Warehouse Co. v. Grannis, 273 U.S. 70 [47 S.Ct. 282, 71 L.Ed. 541]; New York v. Illinois, 274 U.S. 488, 490 [47 S.Ct. 661, 71 L.Ed. 1164]; Willing v. Chicago Auditorium Assn., 277 U.S. 274, 289, 290 [48 S.Ct. 507, 72 L.Ed. 880]; Arizona v. California, 283 U.S. 423, 463, 464 [51 S.Ct. 522, 75 L.Ed. 1154]; Alabama v. Arizona, 291 U.S. 286, 291 [54 S.Ct. 399, 78 L.Ed. 798]; United States v. West Virginia, 295 U.S. 463, 474, 475 [55 S.Ct. 789, 79 L.Ed. 1546]; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 324 [56 S.Ct. 466, 80 L.Ed. 688]. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties

7. The motions division of this court that week consisted of Judges Wilbur K. Miller, Fahy and Wright. At the time counsel appeared before the court, Judge Fahy was attending the Judicial Conference of the United States and Judge Miller was also not in the courthouse.

8. After the writ had become functus officio by its own terms, the life of the patient no longer being in danger, and more than ten days after its issuance, cf. Rule 65(b),

F.R.Civ.P., the patient on October 14 filed a petition in this court, as respondent to the application, seeking to have the order issuing the writ reheard en banc. Substantive constitutional arguments as to freedom of religion, and the right of liberty, were advanced, and the question of mootness was dealt with. Georgetown Hospital filed a reply brief. After consideration, this court en banc denied the petition for rehearing en banc.

in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. Nashville, C. & St. L. Ry. Co. v. Wallace, *supra* [288 U.S. 249], p. 263 [53 S.Ct. 345, 77 L.Ed. 730]; Tutun v. United States, 270 U.S. 568, 576, 577 [46 S.Ct. 425, 70 L.Ed. 738]; Fidelity National Bank [& Trust Co.] v. Swope, 274 U.S. 123, 132 [47 S.Ct. 511, 71 L. Ed. 959]; Old Colony Trust Co. v. Commissioner, *supra*, [279 U.S. 716] p. 725 [49 S.Ct. 499, 73 L.Ed. 918]. And as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required. Nashville, C. & St. L. Ry. Co. v. Wallace, *supra* [288 U.S. 249], p. 264 [53 S.Ct. 345, 77 L.Ed. 730]."

Aetna Life Ins. Co. v. Haworth, *supra* Note 5, 300 U.S. at 240–241, 57 S.Ct. 461, at 464, 81 L.Ed. 617.

 Clearly the "case or controversy" raised here is "justiciable," that is, of the type that courts may be called upon to decide. See Baker v. Carr, *supra* Note 2, 369 U.S. at 198, 82 S.Ct. at 699, 7 L.Ed.2d 663. Were a patient in a hospital, unable to leave, to protest its planned treatment, for the most fundamental reasons, it could hardly be questioned that the judiciary would have jurisdiction to rule upon the issue of the patient's, and the hospital's, rights and

duties. In this area, failure of the courts to declare the law would not place the responsibility for decision in the executive or legislative branches of government. Judicial abdication would create a legal vacuum to be filled only by the notions, and remedies, of the private parties themselves. And if the courts are to act in this area, damage suits *post facto* are a poor substitute for timely declaratory or injunctive relief. Thus if Mrs. Jones had brought an action to restrain the hospital from administering the transfusions, a justiciable controversy would certainly have been presented. The fact that it was the hospital which sought judicial declaration of its rights does not make the controversy less justiciable.[9] Moreover, while the question presented is of utmost importance to those concerned, it is of such infrequent occurrence as to be unlikely to attract the attention of the legislature. Courts sit to decide such questions.

### III.

 Reference to the Court of Appeals, immediately after the denial of the application by the District Court, was proper under the power of federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651.[10] Such "authority is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected." Roche v. Evaporated Milk Assn., 319 U.S. 21, 25, 63 S.Ct. 938, 941,

9. A justiciable controversy is presented when a plaintiff, wishing to embark on a course of conduct, seeks to prevent another from interfering with it. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 200 F.2d 876 (1952); General Electric Co. v. Refrigeration Patents Corp., W.D.N.Y., 65 F.Supp. 75 (1946). The only special questions relevant to the exercise of such jurisdiction are: "Will the plaintiff really take the proposed action and, if so, exactly what action? Will the defendant really then interfere with him, and, if so, exactly how?" Hart & Wechsler, The Federal Courts and the Federal System 139 (1953). Here the

answers to those questions had been made perfectly clear by the actions of the doctors, the hospital's officials, and the patient's husband. See also Note 6, *supra*.

10. The full text of the All Writs Statute, 28 U.S.C. § 1651, is:

"(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

"(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction."

87 L.Ed. 1185 (1943). These "common law writs, like equitable remedies, may be granted or withheld in the sound discretion of the court." *Ibid.*; La Buy v. Howes Leather Co., 352 U.S. 249, 255, 77 S.Ct. 309, 313, 1 L.Ed.2d 290 (1956). The Federal Rules of Civil Procedure, Rule 62(g), recognize the "power of an appellate court *or of a judge or justice thereof* to * * * grant an injunction during the pendency of an appeal or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered." (Emphasis added.) *Cf.* Toledo Newspaper Co. v. United States, 6 Cir., 237 F. 986 (1916), affirmed, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186 (1918); Scripps-Howard Radio v. Federal Communications Comm'n, 316 U.S. 4, 62 S. Ct. 875, 86 L.Ed. 1229 (1942). And this court has provided in Rule 11 of its General Rules that an "injunction pending appeal from the district court in civil cases shall be governed by the applicable provisions of the Federal Rules of Civil Procedure," citing, *inter alia*, Rule 62 (g), F.R.Civ.P. Of course, whether or not there was jurisdiction to decide the merits, until the question of jurisdiction is determined, there was "authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition * * *." United States v. Shipp, 203 U.S. 563, 573, 27 S.Ct. 165, 166 51 L.Ed. 319 (1906). Clearly there was "power to preserve existing conditions while * * * de-

termining [the] authority to grant injunctive relief." United States v. United Mine Workers, 330 U.S. 258, 293, 67 S. Ct. 677, 695, 91 L.Ed. 884 (1947).

The power of a single judge to issue such emergency temporary writs cannot be disputed.[11] 28 U.S.C. § 1651; Rules 6 and 11, General Rules, D.C.Cir.; Rule 62(g), F.R.Civ.P.; Rules 50 and 51, subd. 1, Sup.Ct.Rules. The power of a single circuit judge to grant temporary writs has been exercised in several cases in the recent past. See, *e. g.*, Arrow Transp. Co. v. Southern R. Co., 372 U.S. 658, 662, n. 4, 83 S.Ct. 984, n. 4, 10 L.Ed. 2d 52 (1963); Aaron v. Cooper, 8 Cir., 261 F.2d 97, 101 n. 1 (1958); Woods v. Wright, 5 Cir., 8 Race Rel.L.Rep. 445 (May 22, 1963). Judge Tuttle's action in Woods v. Wright, *supra*, cites 28 U.S. C. § 1651(b) and Rule 62(g), F.R.Civ.P., in ordering, pending the taking of an appeal, that a group of Negro students be readmitted to the Birmingham public schools. The Eighth Circuit's discussion of the power in Aaron v. Cooper, *supra*, shows the familiarity of that Circuit with its exercise.[12] And in Arrow Transp. Co. v. Southern R. Co., *supra*, the Supreme Court recognized this power as recently as last year, characterizing a temporary restraining order granted by "[o]ne judge of the Court of Appeals" as "the *Court of Appeals'* restraining order." (Emphasis supplied.) This authority of a single circuit judge or Circuit Justice has long been exercised,[13] and was sustained by the Supreme Court

11. It has been said that " * * * to grant writs to protect the Court's jurisdiction to inquire into the matter is one of the most usual functions of an individual Justice." United States ex rel. Knauff v. McGrath (unreported) (opinion of Mr. Justice Jackson), quoted in Robertson & Kirkham, Jurisdiction of the Supreme Court § 438 at 894 n. 10 (Wolfson & Kurland ed. 1951). See also, Rosenberg v. United States, 346 U.S. 273, 285, 288, 294, 297, 301–302, 73 S.Ct. 1152, 97 L.Ed. 1607 (1953), affirming the power of a single Justice to grant a stay of execution to preserve the *status quo* until a legal issue could be decided by the whole Court; and Meredith v. Fair, 83 S.Ct. 10, 9 L.Ed.2d 43 (1962), in which Mr. Jus-

tice Black, acting alone, vacated stays granted below and issued his own injunction.

12. Familiarity with this power of a single circuit judge to act on petitions or applications for relief pending appeal is also shown by various provisions in the rules of the several circuits. See Rule 25(5), 1 Cir.; Rule 30(3), 3 Cir.; Rule 33, 4 Cir.; Rule 15, subd. 6, 9 Cir.; Rule 22, subd. 3, 10 Cir.

13. Compare Act of March 2, 1793, § 5, 1 Stat. 334; Act of April 10, 1869, § 2, 16 Stat. 44; Act of June 1, 1872, § 7, 17 Stat. 197; Rev.Stat. §§ 718, 719 (1875).

as long ago as 1855. State of Pennsylvania v. Wheeling and Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855).

The power recognized by Rule 62(g) and the All Writs Statute, 28 U.S.C. § 1651, inheres in the single Supreme Court Justice and the single circuit court judge equally, each exercising the same power within the "respective jurisdictions" of his court. 28 U.S.C. § 1651; 6 Moore, Federal Practice ¶ 54.10 [2] at 61, text at n. 6.1. "The extent to which federal statutes empower a Supreme Court justice [14] to act individually is not widely realized. Broadest has been his power to issue injunctions necessary to the exercise of the Court's jurisdiction, both original and appellate. [Citations omitted.] This power is now apparently embodied in 28 U.S.C. § 1651 (b) (1948) (authorizing issuance of alternative writs)." 62 Harv.L.Rev. 311 (1948). And Professor Moore has said: "By virtue of this provision [§ 1651(b)] an individual Justice of the Supreme Court can give interim relief pending action by the full Court, as by granting or staying an injunction." Moore, Judicial Code Commentary ¶ 0.03(53) at 603 (1949) (citations omitted); see also 6 Moore, Federal Practice ¶ 54.10[3] at 83–84.

Additionally, "if this broadly phrased subsection [(b) of § 1651] is not construed to grant this power [to issue injunctions] to individual Justices, then the power may be found in 28 U.S.C. § 1651(a) which, although it merely confers upon 'courts' the power to 'issue all writs necessary or appropriate in aid of their respective jurisdiction and agreeable to the usages and principles of law', may nevertheless be construed as also conferring upon individual Justices or judges the power to issue such writs where such issuance is customary. Cf.

Bennett v. Bennett, 3 Fed.Cas.No. 1318 [power of lower court judge]." Robertson & Kirkham, Jurisdiction of the Supreme Court § 438, at 893 n. 10 (emphasis added). Illustrative examples of the exercise of this power are given in Stern & Gressman, Supreme Court Practice § 15–23, "Application to an individual Justice—practice in chambers." (3d ed. 1962.)

## IV.

Let us now reconstruct the narrative of events through the medium of the contemporaneous Memorandum of Facts filed in this cause, the substance of which is as follows:

Mrs. Jones was brought to the hospital by her husband for emergency care, having lost two thirds of her body's blood supply from a ruptured ulcer. She had no personal physician, and relied solely on the hospital staff. She was a total hospital responsibility. It appeared that the patient, age 25, mother of a seven-month-old child, and her husband were both Jehovah's Witnesses, the teachings of which sect, according to their interpretation, prohibited the injection of blood into the body. When death without blood became imminent, the hospital sought the advice of counsel, who applied to the District Court in the name of the hospital for permission to administer blood. Judge Tamm of the District Court denied the application, and counsel immediately applied to me, as a member of the Court of Appeals, for an appropriate writ.

I called the hospital by telephone and spoke with Dr. Westura, Chief Medical Resident, who confirmed the representations made by counsel. I thereupon proceeded with counsel to the hospital, where I spoke to Mr. Jones, the husband of the patient. He advised me that, on religious grounds, he would not approve a blood transfusion for his wife. He

14. Rule 6 of this court's General Rules provides that "[e]xcept as otherwise provided in these rules, the practice in this court shall so far as practicable be the same as in the Supreme Court of the United States." Rule 50 of the Supreme Court Rules provides for "Applications to individual justices; practice in chambers"; Rule 51, subd. 1 provides that "* * * writs of injunction may be granted by any justice in cases where they might be granted by the court."

said, however, that if the court ordered the transfusion, the responsibility was not his. I advised Mr. Jones to obtain counsel immediately. He thereupon went to the telephone and returned in 10 or 15 minutes to advise that he had taken the matter up with his church and that he had decided that he did not want counsel.

I asked permission of Mr. Jones to see his wife. This he readily granted. Prior to going into the patient's room, I again conferred with Dr. Westura and several other doctors assigned to the case. All confirmed that the patient would die without blood and that there was a better than 50 per cent chance of saving her life with it. Unanimously they strongly recommended it. I then went inside the patient's room. Her appearance confirmed the urgency which had been represented to me. I tried to communicate with her, advising her again as to what the doctors had said. The only audible reply I could hear was "Against my will." It was obvious that the woman was not in a mental condition to make a decision. I was reluctant to press her because of the seriousness of her condition and because I felt that to suggest repeatedly the imminence of death without blood might place a strain on her religious convictions. I asked her whether she would oppose the blood transfusion if the court allowed it. She indicated, as best I could make out, that it would not then be her responsibility.

I returned to the doctors' room where some 10 to 12 doctors were congregated, along with the husband and counsel for the hospital. The President of Georgetown University, Father Bunn, appeared and pleaded with Mr. Jones to authorize the hospital to save his wife's life with a blood transfusion. Mr. Jones replied that the Scriptures say that we should not drink blood, and consequently his religion prohibited transfusions. The doctors explained to Mr. Jones that a blood transfusion is totally different from drinking blood in that the blood physically goes into a different part and through a different process in the body. Mr. Jones was unmoved. I thereupon signed the order allowing the hospital to administer such transfusions as the doctors should determine were necessary to save her life.

V.

This opinion is being written solely in connection with the emergency order authorizing the blood transfusions "to save her life." It should be made clear that no attempt is being made here to determine the merits of the underlying controversy. Actually, the issue on the merits is *res nova*. Because of the demonstrated imminence of death from loss of blood, signing the order was necessary to maintain the *status quo* and prevent the issue respecting the rights of the parties in the premises from becoming moot before full consideration was possible. But maintaining the *status quo* is not the only consideration in determining whether an emergency writ should issue. The likelihood of eventual success on appeal is of primary importance, and thus must be here considered.

Before proceeding with this inquiry, it may be useful to state what this case does not involve. This case does not involve a person who, for religious or other reasons, has refused to seek medical attention. It does not involve a disputed medical judgment or a dangerous or crippling operation. Nor does it involve the delicate question of saving the newborn in preference to the mother. Mrs. Jones sought medical attention and placed on the hospital the legal responsibility for her proper care. In its dilemma, not of its own making, the hospital sought judicial direction.

It has been firmly established that the courts can order compulsory medical treatment of children for . any serious illness or injury,[15] *e. g.*, People ex

15. The courts of the District of Columbia issue such orders both for necessary surgery, *e. g.*, In re Two Year Old Girl, D.C.Juv.Ct., No. 44-753-J (January 23, 1964), and for necessary blood transfusions refused on religious grounds, *e. g.*, In re One and a Half Months Old Girl, D.C.Juv.Ct., No. 41-033-J (June 7

rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, cert. denied, 344 U.S. 824, 73 S.Ct. 24, 97 L.Ed. 642 (1952); Morrison v. State, Mo.App., 252 S.W.2d 97 (1952); Mitchell v. Davis, Tex.Civ.App., 205 S.W.2d 812 (1947), and that adults, sick or well, can be required to submit to compulsory treatment or prophylaxis, at least for contagious diseases, e. g., Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905). And there are no religious exemptions from these orders, e. g., People ex rel. Wallace v. Labrenz, supra; cf. Hamilton v. Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934), rehearing denied, 293 U.S. 633, 55 S.Ct. 345, 79 L.Ed. 717 (1935). These principles were restated by the Supreme Court in Prince v. Massachusetts, 321 U.S. 158, 166–167, 64 S. Ct. 438, 442, 88 L.Ed. 645 (1944):

"* * * Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parents' control * *. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. [Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643.] The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243 [63 L.R.A. 187] [see also State v. Chenoweth, 163 Ind. 94, 71 N.E. 197; Owens v. State, 6 Okl.Cr. 110, 116 P. 345, 36 L.R.A.,N.S., 633]. * * *"

■ Of course, there is here no sick child or contagious disease. However, the sick child cases may provide persuasive analogies because Mrs. Jones was in extremis and hardly compos mentis at the time in question; she was as little able competently to decide for herself as any child would be. Under the circumstances, it may well be the duty of a court of general jurisdiction, such as the United States District Court for the District of Columbia, to assume the responsibility of guardianship [16] for her, as for a child, at least to the extent of authorizing treatment to save her life. And if, as shown above, a parent has no power to forbid the saving of his child's life, a fortiori the husband of the patient here had no right to order the doctors to treat his wife in a way so that she would die.

■ The child cases point up another consideration. The patient, 25 years old, was the mother of a seven-month-old child. The state, as parens patriae, will not allow a parent to abandon a child, and so it should not allow this most ultimate of voluntary abandonments. The patient had a responsibility to the community to care for her infant. Thus the people had an interest in preserving the life of this mother.

Apart from the child cases, a second range of factors may be considered. It is suggested that an individual's liberty to control himself and his life extends even to the liberty to end his life. Thus, "in those states where attempted suicide has been made lawful by statute (or the lack of one), the refusal of necessary medical aid [to one's self], whether equal to or less than attempted suicide, must be conceded to be lawful." Cawley, Criminal Liability in Faith Healing, 39 Minn.L.Rev. 48, 68 (1954). And, conversely, it would follow that where attempted suicide is illegal by the common law or by statute, a person may not be allowed to refuse necessary medical assistance when death is likely to ensue

1963); In re Two Day Old Infant, D. C.Juv.Ct., No. 37-25-OJ (June 24, 1962).

16. See 21 D.C.Code § 301: "The equity court shall have full power and authority to superintend and direct the affairs of persons non compos mentis, * * * and to make such orders and decrees for the care of their persons * * * as to the court may seem proper. * * *"

without it. Only quibbles about the distinction between misfeasance and non-feasance, or the specific intent necessary to be guilty of attempted suicide, could be raised against this latter conclusion.

■ If self-homicide is a crime, there is no exception to the law's command for those who believe the crime to be divinely ordained. The Mormon cases in the Supreme Court establish that there is no religious exception to criminal laws, and state *obiter* the very example that a religiously-inspired suicide attempt would be within the law's authority to prevent. Reynolds v. United States, 98 U.S. (8 Otto) 145, 166, 25 L.Ed. 244 (1878); Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States (Romney v. United States), 136 U.S. 1, 49–50, 10 S.Ct. 792, 34 L.Ed. 478 (1890). But whether attempted suicide is a crime is in doubt in some jurisdictions, including the District of Columbia.[17]

■ The Gordian knot of this suicide question may be cut by the simple fact that Mrs. Jones did not want to die. Her voluntary presence in the hospital as a patient seeking medical help testified to this. Death, to Mrs. Jones, was not a religiously-commanded goal, but an unwanted side effect of a religious scruple. There is no question here of interfering with one whose religious convictions counsel his death, like the Buddhist monks who set themselves afire. Nor are we faced with the question of whether the state should intervene to reweigh the relative values of life and death, after the individual has weighed them for himself and found life wanting. Mrs. Jones wanted to live.

A third set of considerations involved the position of the doctors and the hospital. Mrs. Jones was their responsibility to treat. The hospital doctors had the choice of administering the proper treatment or letting Mrs. Jones die in the hospital bed, thus exposing themselves, and the hospital, to the risk of civil and criminal liability in either case.[18] It is not certain that Mrs. Jones had any authority to put the hospital and its doctors to this impossible choice. The normal principle that an adult patient directs her doctors is based on notions of commercial contract which may have less relevance to life-or-death emergencies. It is not clear just where a patient would derive her authority to command her doctor to treat her under limitations which would produce death. The patient's counsel suggests that this authority is part of constitutionally protected liberty. But neither the principle that life and liberty are inalienable rights, nor the principle of liberty of religion, provides an easy answer to the question whether the state can prevent martyrdom. Moreover, Mrs. Jones had no wish to be a martyr. And her religion merely prevented her consent to a transfusion. If the law undertook the responsibility of authorizing the transfusion without her consent, no problem would be raised with respect to her religious practice. Thus, the effect of the order was to preserve for Mrs. Jones the life she wanted without sacrifice of her religious beliefs.

The final, and compelling, reason for granting the emergency writ was that a life hung in the balance. There was no time for research and reflection. Death could have mooted the cause in a matter of minutes, if action were not taken to

---

17. *Compare* 22 D.C.Code § 2401 (1961) ("Whoever * * * kills *another* [etc.] is guilty of murder * * *") *with* 18 U.S.C. § 1111(a) (1948) ("Murder is the unlawful killing of a *human being* [etc.]") (emphasis added).

18. Whether or not a waiver signed by a patient *in extremis* would protect the hospital from civil liability, it could not be relied on to prevent criminal prosecution. Death resulting from failure to extend proper medical care, where there is a duty of care, is manslaughter in the District of Columbia. Jones v. United States, 113 U.S.App.D.C. 352, 355, 308 F.2d 307, 310 (1962).

preserve the *status quo*. To refuse to act, only to find later that the law required action, was a risk I was unwilling to accept. I determined to act on the side of life.